Frank P. SLATTERY, Jr.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–280C.

United States Court of Federal Claims.

Aug. 14, 2002.

Thomas M. Buchanan, Winston & Strawn, Washington, D.C., for plaintiffs. Eric W. Bloom, Peter K. Dykema, Winston & Strawn, Washington, D.C., of counsel.

F. Jefferson Hughes, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington D.C., for defendant, with whom were David M. Cohen, Director, and Stuart E. Schiffer, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., Shalom Brilliant, Senior Trial Counsel, Rodger D. Citron, Henry R. Felix, John N. Kane, Jr., and Katherine M. Kelly of counsel.

### OPINION AND ORDER

SMITH, Senior Judge.

### INTRODUCTION

This case is a hybrid of the *Winstar* cases that this court has examined over the last ten years. However, because the court determined liability, if found, might rest on a different statutory foundation, this case has been separated from the *Winstar* case management plan. Because of its hybrid nature the court will address novel issues that are

unique to these plaintiffs. In this opinion, the court addresses the Defendant's Motion for Judgment on the Pleadings and the issues argued by the parties in a six month trial.

Frank Slattery and the other plaintiffs brought this suit as a shareholder derivative action because the FDIC refused to sue itself on their behalf. While Mr. Slattery was president of Lease Financing Corporation (LFC), LFC became a shareholder in Meritor in 1987 and Mr. Slattery became a board member in 1988. In his role as board member he negotiated with FDIC regulators on behalf of Meritor.

This case revolves around a contract that the FDIC and Meritor[1] entered in conjunction with Meritor's 1982 merger with Western Savings Fund, a bank that the FDIC would have closed absent the merger. The FDIC estimated that closing Western would cost the Bank Insurance Fund (BIF) at least $696 million. Instead, the FDIC provided assistance to Meritor to facilitate the merger, with a limited cost to the BIF $294 million.

At the time Meritor did not need to merge with Western. Western was a thrift that had run out of capital in the high interest rate environment. In fact, its liabilities exceeded its assets by $796 million. In 1982, Meritor was experiencing its own challenges as part of the high interest rate environment, but was recognized as a strong thrift by the FDIC.

The FDIC and Meritor engaged in extensive negotiations about what the terms of the FDIC's merger assistance would be. However, some items were non-negotiable including the fact that the difference between Western's assets and liabilities would be treated as goodwill on Meritor's books. Otherwise, Meritor would have been in unsound condition the moment the two thrifts merged because of the absorption of Western's liabilities. Meritor's consideration to enter the merger was to accept Western's assets and liabilities. The FDIC benefitted because the BIF was protected from immediately paying Western's deposit holders. The FDIC also

benefitted in the long run because it made a profit when Meritor was seized in 1992. The profit was very different from the large losses the FDIC expected to absorb if it had seized Western in 1982.

A $7.5 billion thrift in 1981 prior to its merger with Western, Meritor quickly grew into a $17 billion financial services entity by year end 1985. It peaked at $19 billion in 1987. However, the financial markets deteriorated, and the FDIC became increasingly uncomfortable with the perceived threat that Meritor's underperforming assets and Western goodwill were to the BIF. In 1988 the two parties entered a memorandum of understanding which increased the level of tangible capital Meritor had to have on hand. If Meritor did not increase that level by the end of 1988, it had to infuse the thrift with $200 million in capital by March 31, 1989. In the high interest rate, poor savings and loan environment that existed, Meritor determined that the only way to raise that $200 million was to sell 54 of its branches to a competitor. In a sense, that transaction was the beginning of the end.

Selling those 54 branches was likened to selling the bank's crown jewels. They were fast-growing assets for Meritor, which earned income each year. They also had a loyal customer deposit base which made them attractive to the acquirer. However, that left Meritor with a larger percentage of its remaining assets being troubled assets that concerned the FDIC. These assets were nonperforming loans and assets which produced large losses for the bank. As a result, the FDIC again increased the capital requirements on the bank. Its examinations of the bank continued to focus on the Western goodwill and how it would provide no protection to the BIF and should be ignored in violation of the 1982 Memorandum of Understanding (1982 MOU). Thus, instead of lifting the 1988 Memorandum of Understanding (1988 MOU) when the $200 million in capital was infused, the FDIC instead insisted that the bank enter a Written Agreement with the FDIC. Otherwise, the FDIC would issue

---

1. For ease of reference, the court will use the term "Meritor" to refer to both the Pennsylvania Savings Fund Society and Meritor Financial Group. PSFS changed its name to Meritor in 1986.

a cease and desist order against the bank. This was the first time the witnesses in the trial could remember a Written Agreement being issued. Meritor was unable to meet the high capital levels required in the 1991 Written Agreement and was seized and sold on December 11, 1992.

The government has argued this is not a Winstar case. It argues that one distinction is that FDIC had regulatory oversight of the bank, not FSLIC or the Federal Home Loan Bank Board. In addition, it states the bank's goodwill capital was not the sole reason for any of the regulatory actions it took. The court, however, is unconvinced. But for the FDIC's fixation on Meritor's goodwill levels and its effect on the exposure of the BIF to depositor claims if the bank failed, Meritor would not have been required to enter the 1988 MOU and 1991 Written Agreement. But for the 1988 MOU, the bank would not have been forced to sell the 54 branches in 1989 to raise capital to satisfy the requirements of the MOU. But for the severe deterioration of assets that resulted from the sale of the branches and the continued presence of goodwill on Meritor's books, the FDIC would not have required Meritor to increase its capital levels again to a level it could not meet resulting in the closure of the bank in 1992.

Thus, the court finds that the government is liable for breaching its 1982 Memorandum of Understanding with Meritor.

## FACTS

Plaintiff Frank Slattery, a shareholder in and board member of Meritor Savings Bank (Meritor), filed suit to recover damages sustained by himself and similarly situated shareholders when the Pennsylvania Secretary of Banking seized Meritor on December 11, 1992. Meritor was organized in 1816 as a mutual savings bank and operated in Pennsylvania until its seizure on December 11, 1992. It was known as the Philadelphia Savings Fund Society (PSFS) until 1985, and the Philadelphia branches of the bank retained that name until the seizure of Meritor. Plaintiff alleges the FDIC repeatedly breached the 1982 Memorandum of Understanding (1982 MOU) the parties executed when Meri-

tor merged with Western. The 1982 MOU addresses how goodwill will be treated in addition to other capital issues related to the merger.

Plaintiff has sued the United States for alleged contract breaches of actions of the Federal Deposit Insurance Corporation (FDIC). The FDIC provided deposit insurance to Meritor and had regulatory oversight of the bank's operations while it was open. It shared that responsibility with the Pennsylvania Department of Banking which chartered Meritor.

### Bank and FDIC Leadership

At the time of the merger, M. Todd Cooke was the Chairman and CEO of Meritor, a position he held until 1985. In 1985, he became Vice–Chairman of Meritor to help Frederick Hammer transition into his position as Chairman. Mr. Cooke retired from Meritor in 1987 and became a member of the Board of Directors. Mr. Hammer was Chairman from 1985–1988, when he was asked to step down by the FDIC and Pennsylvania Department of Banking (PDB). At that point, Roger Hillas was brought in as chairman, a position he held until the PDB closed Meritor in December 1992. He was well-respected in the financial community and by the FDIC. "I had a high regard for, and most of my staff had a very high regard for ... Hillas." Tr.Trans. at 4904 (Ketcha, FDIC).

Anthony Nocella was the Chief Financial Officer and Executive Vice–President at Meritor from the time of the merger until 1987. Robert S. Ryan served as outside counsel for Meritor from the early 1970s until 1988. Nocella and Ryan played instrumental roles in the 1982 MOU negotiations and had ongoing interactions with the FDIC on behalf of Meritor. Mr. Slattery was a shareholder who became a member of the Board of Directors and in that capacity helped negotiate the 1988 MOU.

William Isaac was chair of the FDIC at the time the 1982 MOU was negotiated and signed. He played a key role in developing the FDIC's goodwill strategy and oversaw the Western/Meritor merger. Robert P.

Gough was the Deputy Director of the FDIC's Division of Bank Supervision and was the FDIC's lead negotiator at the time of the merger. Paul G. Fritts was the Philadelphia Regional Director who oversaw Meritor from 1980 to 1983. He was also the Director of the FDIC's Division of Supervision in 1991 and 1992 and played a role in closing Meritor. After a reshuffling of regions, Edward Lutz, the FDIC's Regional Director in New York, had oversight responsibilities for Meritor from 1984–1988. Nicholas Ketcha was the Regional Director with oversight of Meritor from 1988 until 1992 when the bank was closed. Mr. Ketcha recommended to Washington that the FDIC and Meritor enter the 1991 Written Agreement and that the FDIC launch a Section 8(a) action against Meritor in 1992. *See* Tr. Trans. at 4866 (Ketcha, FDIC). In addition, there were numerous bank examiners who conducted the FDIC's examinations of Meritor on a yearly and then quarterly basis.

Ben McEnteer was the Pennsylvania Secretary of Banking at the time of the Meritor/Western merger. Sarah W. Hargrove was the Pennsylvania Secretary of Banking from March 1987 to January 1995. She exercised her authority to close Meritor on December 11, 1992. Pennsylvania bank examiners participated in reviews with and alternated reviews with FDIC examiners.

### The Role of Capital and Capital Regulations

Capital plays a critical role in financial institutions because it allows banks to make profits by purchasing new loans, mortgages, and properties among other things. The FDIC, in its regulatory oversight capacity, requires banks to maintain capital at a set ratio to assets and keep that capital available for immediate withdrawal. That amount varies depending on the type of institution, the economic environment, and the stability of the bank in question.

In the 1980s and early 1990s the FDIC monitored banks' capital ratios carefully because many banks were in a precarious position and risked failure. The high interest rates of the time made it very difficult for financial institutions to break even because the interest rates they were paying deposit holders were higher than the interest rates the banks were being paid on loans. The institutions had outstanding loans that were at low interest rates over long periods. Many depositors had short term accounts which required the bank to pay the market rate for interest, which was much higher than what the bank was getting in long term income. That lead to operating losses that ate away the banks' capital.

On December 17, 1981, the FDIC published a Statement on Capital Adequacy Policy that required savings banks to maintain at least 5% capital. *See Def.Exh. 442 and 1609; See also* FDIC Statement of Policy on Capital Adequacy, 48 Fed.Reg. 62,693–94 (Dec. 17, 1981). In that Statement, the FDIC stated that it would look for a threshold level of adjusted equity capital of 6% of all adjusted total assets. The minimum acceptable ratio was 5%.

The FDIC also classified different types of capital and identified which ones the FDIC valued. Equity capital was defined "to include common stock, perpetual preferred stock, capital surplus, undivided profits, contingency reserves, other capital reserves, mandatory convertible instruments, and reserves for loan losses." 48 Fed.Reg. at 62,694. If a bank fell below a 6% equity capital level, the FDIC fully intended to exercise its authority to initiate administrative action. *See id.* The Statement was merely an attempt to inform banks of what constituted sufficient capital. It also formalized internal processes at the FDIC and brought uniformity throughout the various regions and examiners who worked in them. *See* 48 Fed.Reg. at 62,693.

In 1984 the FDIC proposed a regulation on capital maintenance which 1) defined capital, 2) established standards for adequate capital, 3) tied the unsafe and unsound bank standard to the capital standard, and 4) established a procedure for banks who were undercapitalized to achieve a stronger capital position. *See* FDIC Capital Maintenance Rule (Rule), 12 C.F.R. § 325, 50 Fed.Reg. 11,128 (Mar. 19, 1985). While the Rule essentially adopted the Statement's definition of primary capital, it carved out an exception

for limited intangibles that had been approved by the FDIC prior to the effective date of the Regulation as long as they were amortized over a fifteen year period. *See* 12 C.F.R. § 325.5, 50 Fed.Reg. at 11,137.[2]

In its comment on the proposed regulation, Meritor suggested that intangibles like goodwill reflect a value that is associated with the merger and the proposed regulation should be changed to allow banks to grandfather goodwill. *See* Pl.Exh. 57. The FDIC issued the regulations in 1985 and for the first-time established minimum capital requirements for insured banks.

The final change in the law and regulations that affected Meritor occurred when Congress passed the Federal Deposit Insurance Corporation Improvement Act (FDICIA), Pub.L. No. 102–242, 105 Stat. 2236, which became law on December 19, 1991. The FDICIA set forth new primary capital requirements for federally insured banks. Effective December 19, 1992, the FDIC published a final rule that implemented the requirements of the FDICIA. In that regulation the FDIC interpreted the FDICIA as prohibiting the inclusion of supervisory goodwill in calculating regulatory capital regardless of contractual language to the contrary. Because the FDIC decided that the Western goodwill would not be grandfathered into the new regulations, Meritor was found to be in an unsafe condition and closed on December 11, 1992.

### 1982: Meritor and Western Savings Fund Society Merge

In March 1982, the FDIC sought proposals from financial institutions to merge with Western Savings Fund Society of Philadelphia (Western), a savings bank that was rapidly becoming insolvent. At a March 3, 1982, meeting William Isaacs, then-chairman of the FDIC, told interested institutions that the FDIC would not allow Western to continue operating unless it merged with a financially healthy bank or savings and loan. Without a merger partner, the FDIC would be forced to liquidate Western and absorb large losses since Western's liabilities outweighed its assets by $796 million. *See* Pl.Exh. 2, at 18 (Meritor 1982 Annual Report). The FDIC estimated that it would cost $696 Million to reimburse Western's insured depositors. *See* Pl.Exh. 24: FDIC News Release (PR–25–82) (Apr. 3, 1982).

On March 25, 1982, Meritor submitted a proposal to acquire Western. This was followed on March 29, 1982, by a revised proposal. The revised proposal included demands that the FDIC provide several forms of assistance including floating notes. The key FDIC concession was a guarantee that "the difference between the liabilities assumed and the total of the market value of the Western assets, less reserves, shall be treated as goodwill and amortized on a straight-line basis over 15 years." *See* Pl. Exh. 22 (1982 MOU).

On April 2, 1982, Western and Meritor executed a plan of merger, articles of merger, and board of directors resolutions approving the merger and submitted an application for merger to the FDIC. On the same day, the FDIC approved the merger. The merger was completed on April 3. *See* Pl.Ex. 26 (Company Newsletter). The FDIC's merger assistance agreement required the FDIC to provide Meritor with financial assistance in exchange for Meritor absorbing Western. That assistance included two Promissory Notes and an Income Maintenance Agreement. At the same time the FDIC and Meritor entered into a Memorandum of Understanding (1982 MOU) which included an agreement about what accounting methods Meritor would use to calculate its capital for regulatory capital purposes. In the 1982 MOU, the parties agreed that Meritor may treat "[t]he difference between the liabilities

---

2. 325.5(b): "Intangible assets approved prior to effective date. Any intangible asset which was booked in accordance with generally accepted accounting principles when acquired and which was approved by the FDIC for inclusion in equity capital prior to effective date of this regulation shall be counted in full as a component of primary capital and shall not be deducted from total assets if it is being amortized over a period not to exceed 15 years or its estimated useful life, whichever is shorter." It should be noted that goodwill appears on both the asset and the capital side of the balance sheet. It is an asset that increases capital by a like amount per the classic definition of capital: assets minus liabilities equal capital.

assumed and the total of the market value of the Western assets, less reserves, ... as goodwill and amortize[ ] [the goodwill] on a straight-line basis up to fifteen (15) years." *See* Def.Exh. 665, Pl.Exh. 22. The Pennsylvania Secretary of Banking also recognized that goodwill would be treated in this way. *See* Pl.Exh. 20 (letter to PSFS from Secretary outlining terms of the merger including how goodwill would be treated). In a FDIC Press Release, FDIC Chairman Isaac stated that, "We consider this to be a solid, minimum-cost solution to the problems of one of our most seriously troubled savings banks. We appreciate the work done by PSFS in helping us put the transaction together." Pl. Exh. 24.

### 1983: Meritor becomes a Stock Savings Bank

On September 22, 1993, Meritor converted from a mutual to a stock savings bank. As part of its public offering, Meritor published an Offering Circular that explained the terms of the agreement between the FDIC and Meritor when Meritor acquired Western. The FDIC reviewed and approved the Offering prior to its release to the public. In the Circular, the merger agreement was outlined as well as the terms of the 1982 MOU, specifically that the difference between fair value and book value was being treated as goodwill that could be counted towards regulatory capital. *See* Pl.Exh. 38/Def.Exh. 392 at 13 (Offering Circular). Meritor sold more than 35 million shares of stock and raised more than $360 million from this offering.

As early as the FDIC's November 30, 1983 Report of Examination, there were signals that the examiners did not like to use goodwill as an asset for capital purposes. In that report, the examiner noted that tangible net worth was a key measure of a bank's stability. He also noted that "[i]f intangible assets [goodwill] are deducted from equity capital,

the bank's adjusted capital ratio on a tangible net worth basis would be only 0.39%." Pl. Exh. 42 page a–1–a. Mr. Albertson, the FDIC's Examiner–in–Charge of the 1983 Examination, stated at trial that "[Goodwill] just wasn't an asset as we're used to. I mean, you look at your capital account and you immediately deduct in your mind, an intangible capital as you would at any company." Tr.Trans. at 828 (Albertson, FDIC, quoting his deposition testimony).

### 1984–1987: FDIC Questions Meritor's Capital Levels

From 1983 to 1985, Meritor rapidly expanded in an effort to become a full-service, national financial organization. In recognition of that, it changed its name to Meritor. However, at the end of 1984, the FDIC again raised concerns about Meritor's capital levels. In July, the FDIC denied Meritor's request to buy back 2 million shares of stock that it had sold when it became a stock savings bank. The main reason for the denial was the "adverse effect the proposed retirement of common stock would have on the bank's already low tangible equity capital position." Pl.Exh. 51 As a result, Meritor officers sought reassurances that the FDIC would honor the 1982 MOU,[3] because "It was significant to us that the FDIC through this memo, appeared to be putting a new twist on our agreement, and they were not, in our judgment, living up to the contractual arrangement .... they were referring to 'already low tangible equity capital position.' In other words, they were excluding from the computation of capital of the goodwill, which by terms of the agreement was expressly to be included." Tr.Trans. at 280 (Cooke, Meritor CEO).

In September 1984 FDIC and Meritor officials met to clarify how the goodwill from the Western merger would be treated. At that time, the Western goodwill boosted Meritor's

---

**3.** "As part of the Memorandum of Understanding concerning the Western Acquisition, goodwill was to be amortized for regulatory purposes. If we agree that the Memorandum of Understanding by the FDIC and PSFS is a binding agreement, then the goodwill established as part of the merger and the capital notes created as part of the assistance package should be treated in ac- cordance with the Memorandum of Understanding. If this is not the case, then PSFS would have had a large amount of negative capital the day after it merged with Western, and I am sure, that this was not the case that anyone had considered." Pl.Exh. 54 (letter from Nocella to FDIC Board of Directors) (Aug. 6, 1984).

capital from .49% tangible to 6.49%.[4] *See* Pl.Exh. 55. Meritor sought a reaffirmation of the 1982 MOU, and the FDIC assured Meritor that the MOU "remains unchanged and in place." Pl.Exh. 62/Def.Exh. 1342.[5]

In 1984 Meritor was also concerned about proposed FDIC regulations on capital maintenance which would make the bank statutorily undercapitalized because the regulation removed intangibles from capital. *See* Pl. Exh. 54–57. Meritor suggested that intangibles like goodwill reflect a value that is associated with the merger and the proposed regulation should be changed to allow banks to grandfather goodwill. *See* Pl.Exh. 57. The FDIC issued the regulations in 1985 and for the first-time established minimum capital requirements for insured banks. Meritor's Western goodwill was grandfathered into the regulations.

At the end of 1985, the FDIC prepared a draft Memorandum of Understanding to increase the capital ratios that Meritor would be required to meet, in part because Meritor was unable to meet the regulatory capital requirements without including the Western goodwill. In a January 1986 letter to Meritor's Board of Directors, Mr. Edward Lutz, a FDIC regional director, stated that "necessary strategies to assure proper administration of bank capital is an integral part of the Memorandum of Understanding we wish to enter into with you" Pl.Exh. 79 at 1 (Jan. 27, 1986 letter). In a confidential memo that accompanied the Report of Examination, Mr Lutz wrote that, "[t]he capital program . . . is considered the primary basis for our entering into a Memorandum of Understanding." Pl. Exh. 77 at 2. In the same summary, Mr. Lutz argued that while "the inclusion of [Western goodwill] amounts in equity is in accordance with regulatory parameters and agreements, further growth and subsequent depositor protection cannot be realistically supported by such equity accounts." Pl.Exh. 77 at 1. The FDIC, however, withdrew the draft MOU after Meritor argued that the Western goodwill was grandfathered into the new capital regulations by the 1982 MOU. *See* Pl. Exh. 76 at 1.[6]

In 1987, the Pennsylvania Department of Banking became increasingly hostile to the goodwill write offs as well. In its Third Quarter Quarterly Monitoring Report, the State examiner said that "[a]lthough the FDIC has apparently acquiesced to this accounting hocus-pocus, the Department of Banking has not yet promulgated its official position . . . . If regulatory capital were charged with the Goodwill write down, capital would fall well below *regulatory minimums and regulatory response in the form of formal action or explicit forbearance would be indicated.*" Pl.Exh. 116 at 2. In addition, Mr Lutz continued to state that the Western goodwill would be written off in a mental calculation when calculating capital adequacy and that the bank should go under forbearance. *See* Pl.Exh. 110 (Memo to Meritor File re: Oct. phone call with Nocella). He was not alone, because as Mr. Nocella remembered at trial, "from time to time, examiners commented on their view of goodwill, as not being included in capital, from their standpoint." Tr.Trans. at 226 (Nocella, Meritor).

This combination of regulatory action and regulator statements made Meritor very nervous about how the FDIC and Department of Banking would treat goodwill in the future. This unease was validated when the FDIC presented a second proposed Memorandum of Understanding to Meritor in 1987. While a MOU was not signed by the parties until 1988, Meritor operated under a cloud of pending, but unknown regulatory action.

---

**4.** It is interesting to note that while the FDIC was challenging Meritor's capital levels, it was also asking Meritor to merger with troubled New York City savings banks.

**5.** The letter also states that "in accordance with the Memorandum, PSFS may continue to amortize the goodwill arising from the Western acquisition over the agreed upon period." *See id.* *See also* Pl.Exh. 58.

**6.** *See* Pl.Exh. 76 at 1 (Letter from Nocella to Lutz) (Jan. 17, 1986) ("The subordinated debt and the intangible arising from the Western transaction are both 'grandfathered' by an agreement entered into at that time, and recognized in the regulations."). "We are unwilling to enter an agreement setting a higher capital ratio target." *Id.* at 2.

### 1988: FDIC and Meritor enter a Memorandum of Understanding

In 1988, Meritor and FDIC entered a Memorandum of Understanding (1988 MOU). The main purpose of the 1988 MOU was to increase tangible capital at the bank. Mr. Ryan, Meritor's outside counsel, remembered there being little to negotiate because, "they [FDIC] wanted and insisted on a MOU, so you sort of took your chances if you didn't go along with the MOU." Tr.Trans. at 356–57 (Ryan, Meritor outside counsel). He testified that the "FDIC's position was, they didn't like the goodwill item and thought that we had lousy capital." Tr.Trans. at 357 (Ryan, Meritor). The MOU was signed at Meritor's July 21 Board of Directors' Meeting and by the FDIC on the first two days of August. The MOU set specific targets for primary capital (6.5%),[7] and those targets were higher than the regulatory rates. In addition, the MOU stated that if the bank failed to reach this capital level by the end of 1988, it would submit a capital plan to the FDIC and infuse the bank with $200 million in tangible equity capital. The bank would also complete a five year strategic plan, review the management, freeze all salaries and bonuses for management, refrain from issuing dividends to stockholders, and submit to close FDIC supervision of these and many other areas of the bank. The bank reluctantly entered the MOU because the alternative appeared to be stricter regulatory action like an 8(a) action. From the uncontradicted testimony it was clear Meritor had no choice in signing the MOU in 1988. Much like the classic movie line by the robber, "Your money or your life!", it was only phrased in the language of choice, but was not a real choice.

On May 9, 1988, Regional Director Lutz and Secretary Hargrove met with Fred Hammer, then CEO of Meritor, to tell him they wanted him to step aside. See Pl.Exh. 147 (May 16, 1988, Memo to FDIC files). After being wooed by the Board of Directors and encouraged by the FDIC, Roger Hillas agreed to become CEO of Meritor in the summer of 1988. Mr. Hillas was a graduate of Dartmouth College and the Wharton School of Business. Prior to joining Meritor, Mr. Hillas had served at Provident National Corporation for thirty-seven years. He brought a wealth of banking experience to Meritor when he became its CEO in 1988.

### 1989: FDIC Threatens Cease and Desist Order and Meritor begins divesting assets acquired during the mid 80s

In his evaluation of Meritor at the end of 1988, Examiner Valinote noted that, "[e]xcept for the capital ratio being below 6.5% and management's tardiness in submitting a satisfactory capital plan, all other provisions of the existing Memorandum of Understanding have been met. Although a comprehensive capital plan may eventually be forwarded it is improbable that even the minimum regulatory ratios can be achieved without outside assistance." Pl.Exh. 195 (Offsite Review/Evaluation Report from Valinote (12/31/88)). After Meritor submitted a Capital Plan ("Plan") in February 1989, the FDIC told Meritor in March that the Plan was not sufficient to satisfy the terms of the 1988 MOU.

In a letter dated April 14, 1989, Mr. Hillas told the FDIC and PDB that Meritor would not be able to attain the capital levels outlined in the 1988 MOU because FSLIC would not allow an Income Capital Certificate (ICC)[8] swap for preferred stock, which made

---

7. Goodwill was included in primary capital. While Meritor was required to reach a primary capital level of 6.5%, the FDIC regulations set the limit at 5.5% for fundamentally sound banks. See FDIC Capital Maintenance Rule, 12 C.F.R. § 325.3 (1985). When asked whether it was "common for the FDIC to require higher than minimum capital ratios in a written agreement," Director Fritts answered, "You didn't get a written agreement under normal circumstances unless the bank was either in problem status or near problem status, and when you've got a written agreement for that reason, the capital standard as it relates to that given bank was generally higher than minimum." Tr.Trans. at 3040–Page 3041 (Fritts, FDIC).

8. FSLIC provided capital assistance to bank acquirers that merged with troubled banks "by purchasing income capital certificates (ICC), which were similar to cumulative preferred stock." See FDIC Resolution Handbook, http://www.fdic.gov/bank/historical/reshandbook/ch6altvs.pdf (Viewed Aug. 14, 2002). See also Def.Exh. 101 (Series of Correspondence between FDIC and Meritor about ICC conversion).

it more difficult to find a buyer for Meritor FA. *See* Pl.Exh. 197 (Hillas letter to Hargrove and Sexton) (Apr. 14, 1989). John Sexton, the Deputy Regional Director for the FDIC, warned Mr. Hillas on April 25, 1989, that the FDIC was considering a Cease and Desist Order absent quick action on the part of the bank to achieve compliance with the 1988 MOU. *See* Pl.Exh. 199. According to a file memo that Mr. Sexton prepared, Mr. Hillas protested that this action could harm the bank's efforts and he was assured that no final decision had been made. *See* Pl.Exh. 199. However, an April 28, 1989, letter from FDIC Regional Director Ketcha to Meritor stressed that it was at risk of falling below the 5.5% capital ratios which could lead to a cease and desist order under 12 C.F.R. 325. *See* Pl.Exh. 200. In that same letter, RD Ketcha emphasized that the FDIC was most concerned with Meritor's inability to meet the capital requirements of the 1988 MOU. *See id.*[9]

The FDIC continued to focus on the "weak" levels of tangible capital Meritor had. In a June 8, 1989, Confidential Problem Bank Memorandum, Regional Director Ketcha wrote that even though "primary and total capital ratios remain about Part 325 minimums ... capital is largely composed of forbearance items which are allowed as primary capital by agreements existing from the 1982 merger of Western Savings Bank." Pl.Exh. 208 (FDIC Problem Bank Memorandum signed by RD Ketcha) (June 8, 1989). Then in a June 15 letter to Meritor's Board of Directors, Ketcha focused on the 1988 MOU's capital infusion requirement which Meritor had not met and tied that to the strong possibility of a Cease and Desist Order because capital had fallen to unsafe and unsound levels. *See* Pl.Exh. 212 (Letter from RD Ketcha to Meritor Board of Directors (June 15, 1989)).

When Meritor failed to meet the 1988 MOU's capital requirements, it was required by the terms of the MOU to raise $200 million in tangible capital. It attempted to accomplish this by selling many of the assets it had acquired during its expansion in the mid 1980s.[10] Bankers Trust and CEO Hillas reported to the Board of Directors that a sale of stock was not a plausible way to raise capital in the 1989 capital market, so Meritor focused on divesting subsidiaries that were sellable. Of course, the way you increase capital by selling assets is selling those that are valued above book value in the marketplace. This also means you are selling your better assets, generally your better money makers. It is less common in the commercial world to get people to buy assets that you do not value for more than your book value, though it does happen.

On August 9, 1989, Bankers Trust and Meritor presented a Capital Plan to the FDIC and PDB that focused on selling bank branches to capture a deposit premium and converting Meritor FA's ICCs to preferred stock (the preferred stock fully qualifies for Tier 1 capital). *See* Pl.Exh. 216 (Bankers Trust presentation to FDIC (Aug. 9, 1989)). Mellon agreed to buy 54 of Meritor's branch offices in exchange for a $331 million deposit premium. After deductions for costs and overhead, Meritor was able to meet the $200 million FDIC capital requirement contained in the 1988 MOU.

### 1990: Meritor placed on list of possibly failing banks

In January 1990, Meritor appeared on the FDIC's list of Projected Bank Failures for

---

9. The letter continues: "As provided by Part 325, your bank would be deemed to be engaged in an unsafe and unsound practice if it has less than the minimum required primary capital ratio and has not established, or complied with, a capital plan acceptable to the FDIC. Such an unsafe and unsound practice may subject the bank to formal supervisory action in the form of a Cease and Desist Order pursuant to Section 8(b) of the Federal Deposit Insurance Act. Our concern over the bank's inadequate capital resources cannot be overly emphasized, and absent timely and effective action by the bank's board, this office is prepared to make a recommendation for such action." Pl.Exh. 200.

10. Meritor sold assets including Meritor Mortgage Corporation—West, Meritor Credit Corporation, Education Financing, Investment Advisory Business, FHA Coinsurance Business, Equibank Servicing, and its credit card portfolio. As part of its divestiture program, Meritor also discontinued its discount brokerage and transferred the accounts to another firm. *See* Pl.Exh. 226.

the first time. *See* Pl.Exh. 235 (FDIC Memo of Projected Bank Failures (Jan. 24, 1990)). In that memo, the author said it was uncertain whether Meritor would be viable after it sold 54 branches to Mellon. *See id.* By March 1, the FDIC and Meritor were meeting to discuss entering a new capital agreement that would apply once the sale of the 54 branches to Mellon was completed. *See* Pl. Exh. 241 (FDIC memo to files (Mar. 1, 1990)). In that Memo, Mr. Francisco, the review examiner who authored the memo, stated that "the bank fully understands that there is risk involved with the proposed merger [sale of 54 branches to Mellon] transaction and that the Corporation could not accept that risk without an agreement regarding capital." *See id.* Discussions and negotiations regarding what that Written Agreement would be continued throughout 1990 until the document became effective on April 5, 1991.

## 1991: Meritor Fails to Meet the Capital Requirements of the Written Agreement

The 1991 Written Agreement (Agreement) replaced the 1988 MOU. In its terms it stated quite clearly that the purpose of the Agreement was to replace the MOU and raise the capital levels of the bank. The Agreement was the outgrowth of FDIC concerns that "the institution's downsizing plans could saddle the institution with an excess volume of either poor quality and/or low earning assets, and with a potentially intractable overhead problem." Pl.Exh. 300, FDIC Memo from Ketcha to Fritts (undated). It was unusual for the FDIC to enter a Written Agreement with a bank rather than a Section 8(b) Cease and Desist Order. *See* Pl.Exh. 302 (Memo from FDIC counsel about Written Agreement (Mar. 12, 1991)). However, the FDIC believed that Meritor's management could be successful in its restructuring efforts. *See* Pl.Exh. 300.

The Agreement explicitly stated that it was terminating the 1988 Memorandum of Understanding, while saying nothing about doing the same for the 1982 MOU. The Agreement required Meritor to maintain a Primary Capital Ratio of not less than 8.5%

and a Risk–Based Capital Ratio of not less than 10.5%. The Agreement included the grandfathered Western goodwill in the Primary Capital Ratio and the Risk–Based Capital Ratio to the extent recognized by the FDIC. *See* Pl.Exh. 300. It also stated that the Agreement "shall" be renegotiated if at any time by act of Congress the "Bank may no longer consider grandfathered goodwill as a capital component ..." Pl.Exh. 297 at 3. The Agreement also stated that no dividends could be paid nor could executive officer compensation be increased while the Agreement was in effect. *See id.* It also required Meritor to make quarterly progress reports to the FDIC and Pennsylvania Secretary of Banking. *See id.* at 4. The Agreement was signed by Chairman Hillas on January 25, 1991.

In a FDIC review of Meritor from November 1991 the examiner outlined the FDIC's ongoing supervisory concerns: "Ill-advised expansion and lending in the mid–1980's, under a different mgt. team, created the unacceptable situation which has placed MSB in a self-liquidating mode, through the sale of branches and non-core businesses, over the last three yrs. This downsizing, notwithstanding significant OH reductions, has depleted future earnings capacity to a point that capital generated from the aforesaid sales will continue to be rapidly dissipated by core operating losses." Pl.Exh. 341 (FDIC Baseline Review Form (Nov. 23, 1991)). At this point, Meritor had shrunk from a high of $19 billion in assets at the end of 1987 to $5.9 billion at the end of 1991. Even this was insufficient to satisfy the FDIC's capital concerns.

## 1992: Meritor Seized

In the spring of 1992, Meritor utilized Project Zeta in an attempt to find a way to retain some value for shareholders while selling the rest of the branches (the "good" bank) and slowly selling the remaining assets (the "bad" bank) as interest rates and the market improved. The plan required FDIC assistance to aid the "bad" bank, until the market recovered. Initially, the FDIC was encouraging and Meritor found several banks and holding companies that were interested in purchasing some of Meritor's assets.

However, any hope of Project Zeta working faded when the FDIC asked Meritor's board for a resolution that would allow it to begin shopping the bank on a closed basis.

The FDIC and PDB began taking steps to close Meritor in the summer of 1992. Drafts of the documents that would terminate Meritor's insurance were being circulated at the FDIC by August 13, *see* Pl.Exh. 419, while the FDIC and PDB reviewed lists of possible banks and holding companies that could absorb Meritor. *See* Pl.Exh. 422. At the same time, Secretary Hargrove expressed concerns about how they could close Meritor when it had a capital ratio that was only 1% lower than required in the Written Agreement. *See* Pl.Exh. 421 at 1. In August, Secretary Hargrove sent a letter to the FDIC that discussed the status of Meritor and the fact that she was reviewing the failing bank letter for Meritor at RD Ketcha's request. *See* Pl.Exh. 421.

On September 17, Secretary Hargrove asked the FDIC to begin the process of resolving Meritor. *See* Pl.Exh. 434. In the letter she states that if Meritor is not recapitalized, she will appoint the FDIC as receiver. *See id.* In Meritor's September 1992 Consolidated Report of Income and Condition, Meritor's tangible capital had decreased to .66 percent of total tangible assets. *See* Pl.Exh. 446. Also, in that Statement, the bank inserted a comment about how the Western Goodwill was being used: "The entire $239.5 million of goodwill reported on Schedule RC–M, item 6.c. arose in the supervisory merger of Western Savings Fund Society in 1982, and is grandfathered by the FDIC. Thus, in the calculation of the Bank's leverage and risk-based capital ratios all goodwill is considered a qualifying intangible asset, and therefore is not deducted from capital." Pl.Exh. 446 at 29.

At Meritor's October 15, 1992, Board Meeting the Board adopted the FDIC's resolution which allowed the FDIC to begin pursuing merger partners for Meritor on an open or closed bank basis. "[I]n effect by signing this, we had turned the control of the institution over to the FDIC, because they reserve the right to meet with the potential bidders for the property." Tr.Trans. at 662–63 (Hillas, Meritor CEO).

In November, the New York Regional Office began the process of gathering support for a Section 8(a) action that would revoke Meritor's FDIC insurance. The foundation for the 8(a) action was that Meritor had been "unable to formulate an acceptable capital plan that does not involve FDIC assistance. Due to inadequate capital relative to the bank's risk exposure, continued operating losses, and the poor quality of assets, the bank is not considered a viable institution." Def.Exh. 546 (FDIC internal Memo about proposed section 8(a) proceedings at 3 (Nov. 3, 1992)).

Secretary Hargrove continued to be concerned about potential liability the PDB might face for closing Meritor. She asked Mr. Fritts whether the FDIC could indemnify the PDB. While she claims this was merely a joke, the FDIC took her request very seriously and addressed her concern at the Board of Directors November 10, 1992, meeting. *See* Pl.Exh. 480 (FDIC minutes (Nov. 10, 1992)).

At the FDIC Directors' meeting on December 9, Mr. Fritts told the FDIC directors that Meritor's tangible capital level of .66% "would be sufficient, as of December 19, 1992, for a finding that Meritor would be 'critically undercapitalized' when the prompt corrective action provisions of section 131" of the FDICIA took effect. *See* Pl.Exh. 502 at CP 00776.

**Procedural History:**

In May 1993, the plaintiff filed a complaint in this court alleging that the FDIC had violated a goodwill agreement and assistance agreement between the FDIC and Meritor. In early 1994, the government filed a Motion to Dismiss or in the Alternative for Summary Judgment that raised three allegations: 1) the court lacked jurisdiction over the complaint; 2) the plaintiffs did not have standing to bring derivative claims, and the plaintiffs were not intended third party beneficiaries of the merger assistance agreement between the bank and FDIC. In its opinion, the court denied in part defendant's motion to dismiss and found that the court had jurisdiction, and

the plaintiffs had standing to bring derivative claims. The court, however, found that the plaintiffs were not intended third party beneficiaries of the merger assistance agreement, and a fact question precluded summary judgment.

Following the court's decision, the plaintiffs filed an amended complaint. In their Amended Complaint, plaintiffs raised the following claims:

1. The FDIC Breached its Contract, specifically the 1982 Assistance Agreement and Memo Of Understanding.

2. The FDIC Breached its Contract, specifically the 1991 Written Agreement.

3. The FDIC unconstitutionally took Property in violation of the Fifth Amendment when it stopped treating goodwill as the MOU required.

4. The FDIC unconstitutionally took shareholder property when it realized a profit on the sale of Meritor after its seizure.

5. The FDIC unconstitutionally took Meritor's property when it negated Meritor's use of goodwill in capital.

Prior to trial, both parties filed motions for summary judgment, which the court denied after oral argument. Trial began in October 1999, and closing arguments were held on June 14, 2000. The trial focused on whether the FDIC breached a contract with the plaintiff regarding the treatment of goodwill that resulted from the Meritor/Western merger.

On April 16, 2001, the defendant filed a motion for judgment on the pleadings. In that motion, the defendant argued that the Non–Appropriated Funds Doctrine precluded the court from having jurisdiction over the dispute. The plaintiff asserted in its briefs that the FDIC is not a Non–Appropriated Funds Instrumentality (NAFI) and thus the doctrine is inapplicable to this case. The court held oral argument on this motion on February 20, 2002.

Plaintiff seeks the following relief from this court: damages to be determined at trial, the purchase price of Western plus interest, the return of shareholders' investment in Meritor, return on investment, damages recovered derivatively be awarded to Meritor in trust for shareholders, and costs, attorney's fees and interest.

Initially, this case was treated together with the 120 plus *Winstar* cases on the court's docket. Those cases, initially along with this case, were stayed pending decisions from the Court of Appeals and the Supreme Court in three test cases. Prior to the Supreme Court's affirmance of liability in *Winstar* this court became convinced that while the principal issues in this case were very similar to *Winstar*, liability if found, would rest on a different statutory basis and therefore would not be governed by *Winstar*. Thus, the court lifted the stay in this case. The case, however, was part of the litigation "traffic jam" created when potential liability was found for a great many very large and very complex cases. Thus, while this case exists in the *Winstar* context and inevitably is analyzed in that contextual background, it should not be overlooked that there were fundamental differences in agency approach and statutory scheme between the FDIC and the FHLB.

## DISCUSSION

In this opinion the court will resolve the defendant's motion for judgment on the pleadings as well as issue its opinion on the plaintiff's breach of contract claims that were the subject of a six month trial. The Court will first examine whether this action is jurisdictionally barred by the Non–Appropriated Funds Instrumentality Doctrine. Then, the court will turn to whether a contract existed between the FDIC and Meritor, the scope of that contract and its terms, what breach if any occurred, and whether the FDIC in fact caused injury to Meritor.

## I. MOTION FOR JUDGMENT ON THE PLEADINGS

In its Motion for Judgement on the Pleadings, defendant asserts that this court lacks subject matter jurisdiction over this dispute because the FDIC is a Non–Appropriated Fund Instrumentality (NAFI). While filing this motion after the trial must be allowed because the defense of lack of subject matter jurisdiction is never waived, *see* RCFC 12(h)(3), it would have been a great waste of

resources by the government if it had been merited. This would have been the case because it would have meant six months were wasted in litigating the case, not to mention judicial resources. The government must understand this in the future.

### A. The Non–Appropriated Funds Instrumentality Doctrine

 A Non–Appropriated Fund Instrumentality (NAFI) is an entity or activity which does not receive its funds from congressional appropriation. *See United States v. Hopkins,* 427 U.S. 123, 125 n. 2, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). Generally, a NAFI does not receive funds from Congress because it receives its income from fees or similar sources. Unless clearly stated otherwise, the United States "assumes none of the financial obligations" of a NAFI and cannot be sued in the Court of Federal Claims for the actions of a NAFI. *Hopkins,* 427 U.S. at 124, 96 S.Ct. 2508 *quoting Standard Oil Co. v. Johnson,* 316 U.S. 481, 485, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942).

 In addition, contract claim judgments against a NAFI are generally outside the jurisdiction of the Court of Federal Claims because 28 U.S.C. § 2517(a)[11] requires all judgements awarded in this court to be paid from appropriated funds. *See Kyer v. United States,* 177 Ct.Cl. 747, 369 F.2d 714 (1966). In 1970, Congress specifically amended the Tucker Act to include express or implied contracts with military and NASA exchanges. *See* Pub.L. No. 91–350, 84 Stat. 449. Since 1970, the court has continued to apply the NAFI doctrine, but has focused on whether Congress has statutorily precluded the use of appropriated funds. *See McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1002 (1982); *see also L'Enfant Plaza Properties, Inc. v. United States,* 229 Ct.Cl. 278, 279, 668 F.2d 1211 (1982). However, the general rule remains that without a showing that Congress intended otherwise, if the sued agency does not receive appropriated funds, then any judg-

ments must come from the agency's non-appropriated funds and not from the United States Judgment Fund, which precludes this court from having jurisdiction.

### B. Under the NAFI Doctrine, there is no distinction between Congress explicitly appropriating funds and clearly stating its intention to do so if necessary.

The defendant relies on the argument that the NAFI doctrine bars jurisdiction in this court because the Tucker Act requires any judgment awarded by this court to come from appropriated funds. In contrast the plaintiff showed a history that supports the premise that Congress has and will continue to provide appropriated funds with the full faith and credit of the United States if the need arose—it simply has not needed to yet.

Fundamentally, the defendant argues that this court lacks jurisdiction because the United States has not assumed the financial obligations of the FDIC by appropriating funds to it. *See El–Sheikh v. United States,* 177 F.3d 1321 (Fed.Cir.1999). The defendant argues that the FDIC is a NAFI because it has not received funds for the operation of the Bank Insurance Fund. Instead, the FDIC's permanent source of funds come from deposit insurance premiums. At the same time the defendant is quick to admit that this court has concluded it possessed jurisdiction in cases like *L'Enfant Plaza,* despite the fact that the comptroller general did not receive appropriated funds. This court's "[j]urisdiction under the Tucker Act must be exercised absent a firm indication by Congress that it intended to absolve the appropriated funds of the United Sates from liability for acts of the Comptroller." *Furash v. United States,* 46 Fed.Cl. 518, 521 (Fed.Cl.2000) *quoting L'Enfant Plaza,* 229 Ct.Cl. at 279, 668 F.2d 1211. This court, however, does not apply *L'Enfant Plaza* blindly. Instead, it has found that "the controlling principle is whether the agency's enabling legislation indicates that Congress intended the activity in question to

---

11. "Except as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the

General Accounting Office of a certification of the judgment by the clerk and chief judge of the court." 28 U.S.C. § 2517(a) (1994 & Supp. 2001).

operate without the benefit of appropriated funds." *Furash*, 46 Fed.Cl. at 521.

■ After questioning the validity of filing this motion years into the case and after a six month trial, the plaintiff counters that NAFI doesn't apply because "[t]he non-appropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the agency, but could not be." *United States v. GE Corp.*, 727 F.2d 1567, 1570 (Fed.Cir.1984). *See also McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996, 1002 (1982). The plaintiff directs the court's attention to *L'Enfant Plaza*, which the Federal Circuit relied on heavily in *Furash* when it examined this court's decision in that case. In *L'Enfant Plaza*, plaintiffs sued the Office of the Comptroller of the Currency. This court had jurisdiction even though no money had been appropriated to the Comptroller in the previous 30 years, because nothing in the OCC's enabling legislation said funds could not be appropriated in the future. In *L'Enfant Plaza* the court recognized that for a party "to sustain jurisdiction here the requirement is not that appropriated funds have been used for the activity but that under the agency's authorizing legislation Congress could appropriate funds if necessary." 668 F.2d at 1212.

The key question the court must answer is what constitutes an appropriation of funds by Congress or a willingness to appropriate such funds. Must the appropriations be an on-going reality, or is a tacit acknowledgment by Congress that money is available all that is necessary. The Federal Circuit in its *Furash* opinion stated that under the *L'Enfant Plaza* test "what matters is whether the agency's authorizing legislation makes clear that Congress intends for the agency—of the particular activity that gave rise to the dispute in question—to be separated from general federal revenues." *Furash*, 252 F.3d 1336, 1340 (2001). In *Furash*, the Federal Circuit stated that "[t]he Court of Federal Claims must exercise jurisdiction absent a clear expression by Congress that it intended to separate the agency from general federal revenues." *Furash*, 252 F.3d at 1339.

■ The FDIC's BIF is a public enterprise revolving fund. *See The Budget for Fiscal Year 2003*. A revolving fund can be established by Congress to give the federal agency the ability to make payments from and deposits to the same account. A revolving fund amounts to "*a permanent authorization* for a program to be financed, in whole or in part, through the use of its collections to carry out future operations." GAO/PAD–77–25 at 47 quoted in GENERAL ACCOUNTING OFFICE, PRINCIPLES OF FEDERAL APPROPRIATION LAW at 15–83 (2d ed.2001).

The Defendant argues that the FDIC Bank Insurance Fund (BIF) is identical to the fund the Federal Circuit reviewed in *Furash*. It further argues that the FDIC has received no appropriations for its operations after its initial stock subscription in 1935 until the enactment of FIRREA.

Congress, however, did indeed appropriate funds to the FDIC when it was created in 1933. *See Banking Act of 1935*, Pub. No. 305 (Aug. 23, 1935) (Section 12B(d)).[12] Nothing in the Act suggests that this appropriation was merely a loan; there is no deadline or indication that Congress intended to be paid back or receive interest if it was reimbursed. The FDIC repurchased the stock in 1948, after Congress passed a law that would allow it to do so at its request. *See* H.Rep. No. 2564, 81st Cong.2d Sess., *reprinted in* U.S.Code Cong. Service 3765, 3766–67.

More recently, in a House Report summary of the major provisions of the Federal Deposit Insurance Corporation Improvement Act of 1991 (PL 102–242) (the "Act"), the House stated quite clearly that "[a]t its present, dangerously low level, the bank insurance fund may not be able to handle many more bank failures. If the industry cannot fulfill the promise of deposit insurance to reimburse depositors in case of failure, the government and taxpayers will have to honor this commitment instead." The reality that taxpayers could be forced to foot the bill if

---

12. "There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $150,000,000, which shall be available for payment by the Sec-retary of the Treasury for capital stock of the corporation in an equal amount, which shall be subscribed for by him on behalf of the United States."

the Insurance Fund were exhausted by a rush of claims is what encouraged Congress to act.[13] In addition, the Act amended the amount that the Treasury could loan to the FDIC and increased that amount from $5 billion to $30 billion,[14] again signifying a clear intent on the part of Congress to appropriate funds as necessary to support the FDIC.

C. The Bank Insurance Fund cannot be distinguished from the other FDIC funds for purposes of the NAFI doctrine.

Finally, the defendant is drawing arbitrary distinctions between the Bank Insurance Fund (BIF) and other FDIC funds that currently receive Congressional appropriations. The court thinks it is clear that the United States would stand behind the BIF and appropriate additional funds as necessary. The fact that such aid has not been necessary does not mean that Congress would not appropriate funds if it did. There is a compelling record to support the proposition that Congress has given the full faith and credit of the Treasury to the FDIC and fully intends to appropriate public money to FDIC if it becomes necessary. *See Senate Concurrent Resolution 72 (128 Congressional Record—Senate 1530) (Mar. 17, 1982)* ("Resolved by the Senate (the House of Representatives concurring), That the Congress reaffirms that deposits, up to the statutorily prescribed amount, in federally insured depository institutions are backed by the full faith and credit of the United States"); *Competitive Equality Banking Act of 1987, Public Law 100–86 101 Stat. 552 (August 10, 1987)* (Title IX Sec. 901(b): "... it is the sense of the Congress that it should reaffirm that deposits up to the statutorily prescribed amount in federally insured depository institutions are backed by the full faith and credit of the United States."); Reforming Federal Deposit Insurance published by Congressional Budget Office, Sept. 1990 at 20 ("The original premium rate charged by the FDIC was not based on the fund's ability to cover anticipated losses; rather, it was based on the ability of banks to pay. Despite that basis for funding, federal deposit insurance has been able to handle normal losses for years. This good fortune gave *the appearance of a self-sustaining fund*.... Backing the deposit insurance with the full faith and credit of the federal government covers any catastrophic loss that might bankrupt the funds; however, this pledge exposes taxpayers to those losses."); Budgetary Treatment of Deposit Insurance: A Framework for Reform published by Congressional Budget Office at xi (May 1991) ("Deposit insurance has only two sources of permanent financing: premiums paid by insured institutions and general fund revenues paid by taxpayers.... General federal funds are a backup and last-resort source of financing for extraordinary losses.").

The FDIC's governing legislation also shows that the United States Treasury can fund FDIC funds if they run out of money:

| Title | FDIC Funds |
| --- | --- |
| 12 USC 1441a(h) | Backup for Resolution Trust Corporation |
| 12 USC 1821a(c)(1) | Backup for FSLIC Resolution Fund |
| 12 USC 1821(a)(6)(E)–(F) and (J) | Backup for SAIF |
| 12 USC 1824: | Treasury is directed to loan money to FDIC if needed up to $30 Billion and FDIC can borrow from BIF members |
| 12 USC 1821(a)(5) | Congress creates the BIF |

---

13. "The primary purposes of the Federal Deposit Insurance Corporation Improvement Act of 1991 are to provide additional resources to the BIF, ..." FDICIA, PL 102–242, 105 Stat. 2236, 1991 WL 236737 at 4.

14. FDIC Improvement Act of 1991, Title I, Sec. 101, H.R.Rep. 102–293, 102nd Cong., 1991 WL 236736 (Nov. 7, 1991) amending 12 U.S.C. § 1824(a).

The court finds that the facts and law support the plaintiff's arguments. The record clearly supports the fact that Congress appropriated funds to the FDIC at the time it was created in 1935 for the purpose of buying stock. In addition, the very nature of how Congress structured the BIF also reflects Congress' intent to make the BIF a continuing appropriation. Finally, Congress has passed several resolutions which clearly articulate that Congress would appropriate funds in the future if the BIF ran out.[15] The very fact that Congress has regularly appropriated or promised to appropriate funds suggests they contemplated the use of appropriated funds to be used if the need arises. Thus, this court has jurisdiction over the parties and the subject of this case.

While it is clear to the court that the government's NAFI argument has little support in the law, interesting consequences might occur if it had been correct. While the doctrine might bar jurisdiction on the contract the plaintiffs might very well have a valid taking claim. This would be so since the constitutional protections of the 5th Amendment apply to the government as a whole. Of course, the FDIC, whether a NAFI or not, is a government agency that uses governmental or sovereign powers to fulfill its mission. It should also be noted if the plaintiffs were to prevail in a taking action they would receive prejudgment compound interest, attorneys' fees and expert fees. These are apparently unavailable in a non-CDA contract action such as that here. The court, however, has in this and in all the Winstar cases but one, stayed the taking claims on the general rule of resolving constitutional questions only if necessary.

A final general point should be made. It may very well be that for purposes of internal operations, building construction, employee pay disputes, and issues of normal daily operations, an agency may be a NAFI and not subject to suit under the Tucker Act. At the same time, its core functions—its actions relating to its central governmental purpose—would not be governed by the NAFI doctrine and therefore would be subject to suit under the Tucker Act. This would in some ways be analogous to the principles of corporate responsibility. If a subsidiary acts in its own name and keeps its own accounts, a creditor cannot pierce the "corporate veil." However, if the subsidiary acts in its operation for the corporation that owns it, that corporation may be subject to the subsidiary's creditors and claimants. The ultimate principal here is fair legal notice to the person who deals with a corporation of what legal entity they are dealing with. While this analogy is not perfect, it is illuminating.

The court now turns its attention to whether the parties had a valid contract that addressed how goodwill would be treated after the Meritor/Western merger, what the terms and scope of that contract were, and whether the government breached those terms.

## II. TRIAL OPINION

This case is before the Court in part because the parties disagree about the meaning of several terms of agreements they entered as part of the Meritor/Western merger. At trial the parties presented evidence about what the terms of the original 1982 contract were and whether those terms were breached. Particular attention was focused on how goodwill from the merger could be used.

The court will first address what the terms and scope of the contract were. Then it will address whether the FDIC breached the contract in 1988 when it imposed a Memorandum of Understanding on Meritor or in 1991 when the parties entered a Written Agreement. Finally, the court will examine wheth-

---

**15.** This is in addition to the many statements made on the record by individual Senators and Congressmen that the full faith and credit of the United States stands behind the FDIC and its deposit insurance.

er the FDIC played a role in the December 1992 closing of the Meritor and thereby breached the 1982 Memorandum of Understanding (MOU).

A. Meritor and the FDIC entered a Legally Enforceable Contract when they executed the 1982 Merger Assistance Agreement and accompanying Memorandum of Understanding and the Use of Goodwill was an Enforceable Term of the 1982 Memorandum Of Understanding

■ The defendant alleges that the 1982 Memorandum of Understanding (MOU) goes no further than stating that the FDIC would be unopposed to certain of Western's assets being classified as goodwill for accounting purposes. Specifically, the MOU states that the "FDIC would not object to the following: ... The difference between the liabilities assumed and the total of the market value of the Western assets, less reserves, may be treated as goodwill and amortized on a straight-line basis up to fifteen (15) years." 1982 Memorandum of Understanding, Pl.Ex. 22; Def.Ex. 665.

The court, however, finds it would have been madness for Meritor to merge with Western absent the 1982 MOU and its accompanying treatment of goodwill. As the Supreme Court recognized in *United States v. Winstar*, 518 U.S. 839, 854, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), "ordinarily, goodwill is recognized as valuable because a rational purchaser would not pay more than assets are worth; here, however, the purchase is rational only because of the accounting treatment for the shortfall." The merger between Meritor and Western was rational only because goodwill could be treated as capital for accounting purposes. Absent that, Meritor would have been operating in an unsound condition the moment it signed the merger documents.

Through the voluminous testimony presented at the six month trial, a clear record of the intent of the parties as they negotiated the 1982 MOU was presented to the court. Four of the key negotiators were called as witnesses: William Isaac, then chair of the FDIC; Robert Gough, Deputy Director, Division of Bank Supervision at the FDIC; Anthony Nocella, Executive Vice–President—Finance for Meritor; and Robert S. Ryan, partner at Drinker, Biddle & Reath and outside counsel for Meritor. Their testimony paints a vivid picture of the negotiations between Meritor and FDIC.

The key participants from both Meritor and the FDIC recognized that the merger would not work without goodwill. ".. [I]f goodwill were not included as an asset, the merged institution would have a negative net worth the day that ink was dry on the paper ... the significance was, we certainly wouldn't enter into an arrangement which would immediately make us insolvent, the merged institution." Tr.Trans. at 274–275 (Cooke, Chairman of Meritor when '82 MOU signed). "Nobody in their right mind is going to enter into a transaction where the regulator says you can put in your capital ratios, but remember, two months from now, they can come down and say, you know, I don't like the goodwill in your capital assets, so I'm going to start treating you as though you don't have enough capital." Tr.Trans. at 333 (Ryan, Meritor outside counsel).[16] "Q: Why did you accede to the request to carry the goodwill? A: If I didn't, their capital account would have been—after the merger or after the transaction was completed, would have been in such a state as to raise supervisory concerns." Tr.Trans. at 2730 (Gough, FDIC Deputy Director, Division of Bank Supervision). Thus, the court finds that both parties knew that the goodwill clause in the 1982 MOU was key to the merger because without that guarantee from the FDIC, it would have been madness for Meritor to merge with Western for the benefit of the FDIC.

In addition, the defendant asserts that there was insufficient evidence presented at trial to indicate that the MOU meant more than the words state. The court, however, disagrees based on the testimony of wit-

16. "The goodwill was to be counted as an asset and amortized over 15 years, not 13 years or until some examiner thought that he was worried about the goodwill; it was to be treated as an asset and amortized over—over 15 years. Otherwise, we would have been idiots to have entered into the transaction." Tr.Trans. at 368 (Ryan, Meritor).

nesses who actively participated in the merger and corresponding negotiations.

The Court of Appeals for the Federal Circuit has stated the standard this court must use in evaluating whether a contract exists and what that contract might mean in *Winstar*-related cases. "A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir. 1995), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

Mr. Isaac provided the court with important insights into how the FDIC directors viewed the challenges presented by the high interest rates. As a board member of the FDIC, Mr. Isaac oversaw a task force that addressed what the FDIC should do in the face of so many banks failing for lack of capital. The interest rate environment was such in the late 1970s and early 1980s that many banks could not maintain healthy levels of capital.[17] Confronted with the possibility that hundreds of banks could fail, the task-force evaluated what, if anything, the FDIC could do to manage the crisis. The FDIC addressed the problem by merging stronger banks with the failing institutions and "giving very real assistance to these banks, in the form of notes or cash or financial assistance, by paying out designated asset basis over a period of time." Tr.Trans. at 2696 (Gough, FDIC). The FDIC developed assistance packages by working with the merging banks: "they could take notes, they could take cash, they could get a guaranteed payment on a certain defined asset base or any combination thereof." Tr.Trans. at 2699 (Gough, FDIC).

As the FDIC sought a stronger bank to merge with the failing Western Saving Fund Society (Western), it became clear that even the healthiest banks would need assistance. According to Mr. Gough, the bidding banks could create any bid scenario they wanted, and "it was up to the FDIC to price that to see which was the cheapest way of doing it, short of liquidating the institution, and we were very flexible." Tr.Trans. at 2709 (Gough, FDIC). The FDIC sought a viable institution to merge with Western. By viable, the FDIC examined whether the bidding bank had "the necessary management and asset structure to create a profitable institution that would continue into the future." Tr.Trans. at 2711 (Gough, FDIC). The FDIC "had to have a high confidence level in the management, that they could work through any potential problems they might see." Tr.Trans. at 2723 (Gough, FDIC). The FDIC determined that Meritor was the most viable bank to merge with Western.

A key point of negotiation between the FDIC and Meritor was how goodwill would be handled. After several days of intense negotiations, the parties decided Meritor would carry goodwill as an asset that would be amortized over 15 years as part of the merged institution's capital. *See* Tr.Trans. at 273 (Cooke, Meritor); Tr.Trans. at 114–115 (Nocella, Meritor Vice President) ("... [G]oodwill is established as part of the merger and the capital notes should be treated in accordance with the memo .... if that wasn't the case, you would have negative capital the very day you did the transaction."). "The basic outlines [of the 82 MOU] were never in contention. That is, it would be purchase accounting, that there would be a capital infusion, that there would be an income maintenance agreement, and that the goodwill could be counted as an asset." Tr.Trans. at 335 (Ryan, Meritor).

According to those who participated in the negotiations, the terms of the MOU were clear. "The agreement was put together because Western was being marketed on the basis that because there was purchase accounting, we would try to make—ensure that the institution would not be harmed." Tr. Trans. at 176 (Nocella, Meritor). Chairman Isaac believed the FDIC "had an obligation

---

17. "In 1981 there was a task force that was an internal task force that was formed to implement the resolution of the mutual savings bank problem." Tr.Trans. at 2695 (Gough, FDIC). "[The problem was that banks] were paying more for their deposits than they were getting on their assets.... Being mutual, there were no owners to them, and if you want to go ask for capital, who in the hell did you go to? Nobody could raise capital, there was no stock or anything, the only capital they had was their undivided profits...." Tr.Trans. at 2697 (Gough, FDIC).

to treat the goodwill as capital for all purposes in our analysis of the bank and consider that when we compare the bank to its peers based on capital or earnings, but that doesn't mean that the bank was free to do whatever it wanted otherwise." Tr.Trans. at 1583 (Isaac, FDIC). "Agreement goodwill was goodwill that either the FDIC ... had agreed that an individual bank could book, could continue to carry on its books, that was created by either failure transactions or failing bank transactions that facilitated a takeover of a weak institution." Tr.Trans. at 3007 (Fritts, FDIC). "[T]here was no thought but that the goodwill would be treated any differently than any other good sound asset on the books of [Meritor], and as I said, the transaction couldn't go without that. It just would put [Meritor] in a position where it's subject to supervisory control for having entered into the transaction." Tr.Trans. at 334 (Ryan, Meritor).

The court finds that PSFS and the FDIC executed a legally enforceable contract when their duly authorized agents signed the Merger Assistance Agreement and Memorandum of Understanding on April 3, 1982. The parties were involved in extensive negotiations to determine the final terms fo the merger. In addition, the FDIC entered the agreement "to get a bank that was viable into the foreseeable future, and we wanted to do everything we possibly could to make sure it succeeded. There was no other reason for entering into the agreement." Tr.Trans. at 2817 (Gough, FDIC Negotiator).

B. The 1982 MOU was not superceded by the 1988 MOU or by the 1991 Written Agreement.

■ The defendant also asserts that even if the plaintiff's interpretation of the 1982 MOU were correct, that MOU was modified by the 1988 MOU and the 1991 Written Agreement (Agreement). Specifically, since the 1982 MOU could only be modified in writing, the defendant argues its terms were narrowed by the additional contracts so that no breach occurred in 1988, 1991, or 1992 as

the plaintiff alleges. After a careful review of those documents, the court is unpersuaded by the defendant's argument.

The 1982 MOU incorporates by reference the 1982 Merger Assistance Agreement.[18] That Merger Assistance Agreement (MAA) is a detailed map of the financial assistance the FDIC would provide to PSFS for merging with the failed Western. In Section 11.10 of the MAA, the parties address how the terms of the agreement can be changed. Specifically, "[n]o modification, rescission, waiver, release, annulment, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the parties hereto or their duly authorized representatives." Thus, the parties established a clear method to alter the terms of the MAA. Neither the 1988 MOU or the 1991 Agreement followed the process as described in Section 11.10. Thus, those documents did not alter the 1982 MOU.

The 1988 MOU was implemented because, "[t]he Reports of Examination ('Reports') of Meritor Savings Bank, ... disclose certain weaknesses in the condition of the Bank; in particular, an inadequate level of capital, poor earnings performance, deteriorated asset quality, insufficient liquidity, too large an exposure to interest rate risk and speculative activity in bond trading." Pl.Exh. 171 at 1. Nowhere in the 1988 MOU do the parties address the 1982 MOU. Specifically, they do not address the fact that the 1988 MOU modifies, rescinds, or releases either signatory from its contractual duties as outlined in the 1982 MOU. Thus, the 1982 MOU was not altered by the 1988 MOU.

The 1988 MOU also contains a clear provision for changing or altering the MOU. "The provisions of this Memorandum shall remain effective except to the extent that, and until such time as, any provisions of this Memorandum shall have been, in writing, modified, terminated, suspended, or set aside by the Federal Deposit Insurance Corporation and the Banking Department." Pl.Exh. 171 at 6.

18. The introductory paragraph of the 1982 MOU states, "This memorandum is to confirm the understanding of the Federal Deposit Insurance Corporation (FDIC) and The Philadelphia Saving Fund Society ('Bank') regarding the computation of Income Maintenance Payments called for under Subsection 6.2 of the Merger Assistance Agreement of even date herewith and the use of PSFS of certain accounting methods."

In the 1991 Agreement, the parties specifically state that one purpose of the Agreement was to rescind the 1988 MOU.[19] Once again, they did not address in writing that one purpose was to modify, rescind, or release either party from their obligations under the 1982 MOU. Instead, the 1991 Agreement specifically recognizes the goodwill that PSFS obtained from its merger with Western.[20] So rather than rescind or modify the 1982 MOU, the 1991 Agreement recognizes the continuing effectiveness of the terms of the MOU—at a minimum as applied to goodwill. As one FDIC examiner put it at trial, "Once again ... I never reviewed the complete 1982 memorandum of understanding.... Did I believe it was in effect? It was memorialized in the 1988 MOU, and it was also included in the written agreement in 1991." Tr.Trans. at 1805 (Fitzgerald, FDIC examiner).

Thus, the court finds that where the parties intended to rescind, cancel, or replace a previous agreement, they were very clear in that intent. That is exactly what they did when the 1991 Agreement cancelled the 1988 MOU. That same specific purpose and clarity was not expressed toward the 1982 MOU. Thus, the court determines that the parties did not intend to replace or rescind the 1982 MOU with either the 1988 MOU or the 1991 Agreement. Instead those documents were merely additions to the 1982 Merger Assistance Agreement and MOU.

C. Since the 1982 MOU was a Legally Binding Contract Between the Parties, the Defendant Breached the Terms of that Contract on Several Occasions.

In its amended complaint and at trial, the plaintiff asserted that the 1982 Assistance Agreement and Memorandum of Understanding were a binding contract authorizing Meritor to amortize goodwill over 15 years once authorized individuals signed the documents. The court agrees with plaintiff. In consideration for the Agreement and MOU, Meritor assumed Western's liabilities and agreed to operate and manage Western. The plaintiff further argued that the defendant breached the terms of the 1982 MOU on at least three occasions. The plaintiff alleges that the contract was breached on August 1, 1988, when the FDIC threatened to take adverse action if Meritor did not agree to higher capital ratios. In April 1991, the FDIC again threatened to take adverse action if Meritor did not sign a new Written Agreement, which the plaintiff alleges was another breach of the 1982 MOU. Finally, in December 1992, the FDIC determined that it would no longer include goodwill when calculating Meritor's capital, again breaching the terms of the contract. According to the plaintiff, these breaches proximately caused the Pennsylvania Secretary of Banking to seize Meritor. The court turns its attention to whether any of these actions constitute a breach of the 1982 MOU.

*1. The FDIC's Capital Policies: Was there a capital policy in place in the early 1980s that applied to the merged bank?*

An important consideration as the court evaluates whether certain actions defendant took were breaches of the 1982 MOU is what capital regulations existed at the time the 1982 MOU was signed.[21] At the time of the merger, the FDIC had a Capital Adequacy Policy that required savings banks to maintain at least 5% capital. *See* Def.Exh. 442 and 1609. The FDIC's Statement of Policy on Capital Adequacy (Statement) was published in the Federal Register on December 17, 1981. *See* FDIC Statement of Policy on Capital Adequacy, 48 Fed.Reg. 62,693–94 (Dec. 17, 1981). In that Statement, the FDIC stated that it would look for a thresh-

---

19. "Whereas, in order to induce the FDIC and the Department to terminate the Memorandum of Understanding entered into among the Bank, the Department, and the Regional Director of the New York Region of the FDIC ('Regional Director') on August 2, 1988; ..." *Id.* at 1.

20. Section 1.(b)(ii) states that "the remaining balance of the goodwill related in conjunction with the Bank's acquisition of the Western Savings Fund Society, Philadelphia, Pennsylvania ('Western'), to the extent recognized by the FDIC ('grandfathered goodwill'); ..." The Agreement uses a similar definition in section 1.(c)(ii).

21. While it's clear to the court that a capital policy existed, the parties agree that no capital regulations existed in 1982 that applied to savings banks, and therefore to Meritor. *See Defendant's Proposed Findings of Fact # 3.*

old level of adjusted equity capital of 6% of all adjusted total assets. The minimum acceptable ratio was 5%.

In the Statement, the FDIC classified different types of capital and identified which ones the FDIC valued. Equity capital is defined "to include common stock, perpetual preferred stock, capital surplus, undivided profits, contingency reserves, other capital reserves, mandatory convertible instruments, and reserves for loan losses." 48 Fed.Reg. at 62,694. If a bank fell below a 6% equity capital level, the FDIC fully intended to exercise its authority to initiate administrative action. *See* 48 Fed.Reg. at 62,694. The Statement was merely an attempt to inform banks of what constituted sufficient capital. It also formalized internal processes at the FDIC and brought uniformity throughout the various regions and examiners who worked in them. *See* 48 Fed.Reg. at 62,693.

It is clear from the trial testimony that while the Statement existed, FDIC officials understood many banks would be unable to satisfy the 6% requirement in the market as it existed in the early 1980s. *See* Tr.Trans. at 1510 (Isaac, FDIC Director) ("the FDIC generally at that time wanted capital to be around 5 percent or more, and we decided that, rather than trying to precipitate problems, when they drop below 5 percent, we would wait until they got down closer to zero because time was money to us."); Tr.Trans. at 2748 (Gough, FDIC) ("Clearly … as far as savings banks go, they have no equity capital. There is no equity. So, what the corporation did is apply a 5 percent capital ratio, I believe, to savings banks."). The overarching concern, however, was protection of the limited resources in the FDIC's insurance fund. *See* Tr.Trans. at 3113 (Lutz,

FDIC) ("the 5 percent was applicable, provided the analysis that embodies all of those variables … indicates there is no undue level of risk to the FDIC."). The FDIC Directors knew that the problem was much greater than the extent of the fund, thus, they turned to goodwill as one way—even if not favored—to provide short term protection to the fund. *See* Tr.Trans. at 1512 (Isaac, FDIC) ("We didn't want to have to liquidate them [banks with zero capital], because if we … paid off the insured depositors and liquidated, we were going to be facing enormous losses …"); Tr.Trans. at 2735 (Gough, FDIC) ("we still are not crazy about goodwill, we're not going to require you to get rid of it immediately, we're going to allow you to carry it on your books for 15 years but you have to amortize it;").

### 2. The Plaintiff's 1988 Memorandum of Understanding Claim does not violate the Statute of Limitations

Defendant alleged in its post-trial brief that this court lacks jurisdiction over the 1988 MOU because plaintiff failed to raise this claim prior to 1997 when he amended the complaint. Defendant also stressed that an "entirely new claim" cannot relate back under Rule 15(c) of the Rules of the Court of Federal Claims. *See White Mountain Apache Tribe v. United States*, 8 Cl.Ct. 677, 682 (1985).[22] The court is mindful of the fact that the defendant brought the 1988 MOU to the attention of the court. We are also mindful of the fact that the 1988 MOU is merely used in the complaint as evidence of a breach of the 1982 MOU, not a separate claim.[23]

Because the plaintiff is not basing a claim in this action on the 1988 MOU but merely using it as evidence, the court finds the de-

---

**22.** Rule 15(c) was amended when the Rules of the Court of Federal Claims were amended on May 1, 2002. Because this case was filed in 1993 and the amended complaint was filed in 1997, the new rules do not apply to the question of whether the 1988 claim relates back to the original complaint.

**23.** The two paragraphs in Count One of the Amended Complaint that reference the 1988 MOU are as follows:

72. In or about August, 1, [stet] 1988, the FDIC threatened to take adverse action against

Meritor if the institution did not agree to the higher capital ratio requirement contained in the 1988 MOU. The 1988 MOU required, among other things, Meritor to maintain a Primary Capital Ratio of net [stet] less than 6.50 percent.

73. In breach of the parties' 1982 Agreement, the FDIC required this higher ratio to effectively offset or discount some or all of Meritor's goodwill. Thus, by raising Meritor's ratio requirement, the FDIC effectively took away some or all of Meritor's goodwill.

fendant's statute of limitations defense moot. Even if the court found the plaintiff was basing a claim on the 1988 MOU, the defendant's statute of limitations defense would be moot because the Rules of the Court of Federal Claims provide a mechanism for some claims to be brought which would otherwise be barred by the statute of limitations. Rule 15(c) provides that when a claim in an amended pleading arises out of the transaction involved in the original pleading the court will deem the amended action to "relate back" to the original filing.[24]

As this court has stated previously, "[t]he rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Hemphill Contracting Co. v. United States,* 34 Fed.Cl. 82, 87 (1995) (quoting *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 150 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam), *reh'g. denied* 467 U.S. 1231, 104 S.Ct. 2691, 81 L.Ed.2d 885 (1984)). Thus, the rule does not extend to amendments that raise new claims. *See id.* When this court has analyzed the relation back doctrine in other cases it has focused on a key issue: Did the defendant have notice of the potential claim? *See Vann v. United States,* 190 Ct.Cl. 546, 557, 420 F.2d 968 (1970); *Moore v. United States,* 42 Fed.Cl. 595, 597 (1998); *Snoqualmie Tribe v. United States,* 178 Ct.Cl. 570, 587–88, 372 F.2d 951 (1967). *See also Stephenson v. United States,* 37 Fed.Cl. 396, 406 (1997). *See also Korody–Colyer Corp. v. General Motors Corp.,* 828 F.2d 1572, 1575 (Fed.Cir. 1987) (did original complaint provide "adequate notice of the new claim"); *Baldwin Park Comm. Hosp. v. United States,* 231 Ct.Cl. 1011, 1012 (1982).

The court finds after a careful review of the original complaint that while the 1988 MOU is not specifically mentioned in that pleading, the plaintiff outlined multiple violations of the goodwill agreement by the defendant over the period of time from 1982–1992. Specific examples of violations are cited from 1983, *see* Am.Compl. ¶ 37–40, 1984, *id.* at ¶ 41, 1991, *id.* at ¶ 37–40, and 1992, *id.* at ¶ 47–61. As such the references in the Amended Complaint to the 1988 MOU are a natural part of that chronology which relates back to the Original Complaint, which was filed within the six year statute of limitations.

Defense counsel raises another objection to the 1988 MOU and points the court to assertions plaintiff's counsel made in a 1994 response to defendant's motion for leave to file a supplement.[25] In that motion, the plaintiff stated "both the 1988 and 1991 agreements were *consensual,* thereby constituting a waiver by Meritor to the extent either altered previously existing contractual commitments." Pl.'s Resp. to Def.'s Mot. Leave to File Supplement to Def.'s Pending Mot., Def.'s Supplement, and Def.'s Reply (Sept. 14, 1994). The defendant argues that this statement prevents the plaintiff from raising the 1988 MOU as an issue.

The record developed at trial makes it quite clear to the court that the 1988 MOU was not consensual. Meritor was clearly under duress to enter into the 1988 MOU. It is the classic scenario where individuals are offered the choice of their money or their life. The transaction may have been structured as voluntary, but Meritor had a gun held to its head. As the court has discussed in the fact section and will elaborate in the following section, the 1988 MOU was used by the FDIC as a regulatory tool unlike the 1982 MOU which was voluntarily entered by both parties. In 1982 Meritor was free to choose

24. "Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." This is the text of the rule prior to the May 1, 2002, amendment.

25. Pl.'s Resp. to Def.'s Mot. Leave to File Supplement to Def.'s Pending Mot., Def.'s Supplement,

and Def.'s Reply (Sept. 14, 1994). This motion was in response to Defendant's motion which stated that the "1991 Written Agreement refers to, and, therefore should be interpreted in light of, the 1988 MOU." Def.'s Mot. Leave to File Supplement to Def.'s Pending Mot., Def.'s Supplement, and Def.'s Reply at 12 (Sept. 7, 1994). The Defendant sought to file a copy of the 1988 MOU with the Court, and the Court granted that Motion.

not to engage in the merger. By 1988 Meritor had not choice but to sign the MOU or face severe regulatory sanctions.

Finally, whether counsel made the statement is not relevant because it can not be used as evidence. Courts have determined that pleadings and complaints are not evidence. *See United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir.1995) ("A defendant is not entitled to rely on the government's allegations in the pleadings, or positions the government has taken in the case, to establish standing. The government's assertions in its pleadings are not evidence.") (citation omitted); *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1424 (7th Cir. 1986) ("Complaints are not evidence."). However, it is less clear, and the case law in this court sheds no light on, whether these same principles would apply to replies to motion to amend a filing.[26] However, the court determines that these motions have less probative value than a pleading would, and a pleadings evidentiary value is questioned. Thus, the court finds that the plaintiff's 1994 statements have no evidentiary value.

The defendant also alleges it was prejudiced by the late notice of the 1988 MOU because Maurice Henderson, a potential witness for the defendant, died four months after the amended complaint was filed. The defendant knows Mr. Henderson was a FDIC examiner and thinks he may have drafted the 1988 MOU.

The court thinks any potential prejudice the defendant may have suffered is more than outweighed by several factors. First, the defendant first raised the issue of the 1988 MOU in September 1994, at least three years prior to Mr. Henderson's death. That three years provided ample time for the defendant to depose or at a minimum talk with Mr. Henderson prior to his death.

Second, several witnesses who were involved with the drafting and signing of the 1988 MOU testified in depositions and at trial. After the complaint was amended in 1997, the parties engaged in more than fifty depositions and exhaustive discovery—all of which provided the defendant with ample opportunity to explore any defense it might raise against the use of the 1988 MOU, which it first brought to the court's attention. Indeed, the parties took the depositions of the following individuals who were involved with the 1988 MOU: 1) The examiner in charge in 1987 who recommended the imposition of the 1988 MOU (Albertson); 2) the number two examiner (Fitzgerald); 3) Head of the Pennsylvania state examination team who participated in the 1987 examination (Metzger); 4) the FDIC Assistant Regional Director who supervised the bank at the time of the MOU (Wyka); 5) FDIC Regional Director who negotiated the terms of the 1988 MOU (Lutz); 6) the FDIC Regional Director who enforced the 1988 MOU (Ketcha); and 7) the bank's representative in the negotiations (Slattery). Of those seven, Slattery, Albertson, Ketcha and Lutz testified at the trial.

Third, the defendant knew for four years prior to the amended complaint that the plaintiff was raising questions about how the FDIC treated Meritor's goodwill from at least 1983 to 1992. The defendant had four years in which to talk to Mr. Henderson and determine whether he had anything to offer that other witnesses did not. For all of these reasons, the court finds that the defendant was not prejudiced by the absence of Mr. Henderson as a witness.

The court finds that the defendant was not prejudiced by the inclusion of the 1988 MOU in the Amended Complaint for the reasons stated above. The court also finds that the plaintiff outlined a progression of breach in the original complaint which put the defendant on notice that the FDIC's actions between the years 1982–1992 were at issue in this action. Thus, the references to the 1988 MOU in the Amended Complaint do not violate the six year Statue of Limitations.

### 3. The 1988 Memorandum of Understanding

The plaintiff asserts that the defendant breached the terms of the 1982 MOU

---

**26.** Especially in a case like this where it was the defendant's second motion to amend its summary judgment motion.

when it required Meritor to sign the 1988 MOU because the capital levels used in the 1988 MOU are excessively high unless the FDIC was ignoring the Western goodwill when it calculated Meritor's capital.

The 1988 MOU was signed at Meritor's July 21 Board of Directors' Meeting and by the FDIC on the first or second of August. It set specific targets for primary capital (6.5%),[27] which were higher than regulatory rates. In addition, the MOU stated that if the bank failed to reach this capital level by the end of 1988, it would submit a capital plan to the FDIC and infuse the bank with $200 million in tangible equity capital. The bank would also complete a five year strategic plan, review the management, freeze all salaries and bonuses for management, refrain from issuing dividends to stockholders, and submit to close FDIC supervision of these and many other areas of the bank.

Once Meritor failed to meet the December 31, 1988, deadline for raising its capital ratio, the bank then had to raise $200 million in capital. Theoretically, there were several ways the $200 million could be raised. Meritor could raise money in the capital markets. However, as Mr. Hillas noted, "we did not see in any existing markets at that time and ability to raise equity, bonds, whatever, because the market didn't exist for thrift institutions in the public markets." Tr.Trans. at 624 (Hillas, Meritor CEO). This evidence was uncontradicted. Another possibility was to sell or issue more stock to the shareholders.[28] "[T]he board never indicated any reason not to issue stock if it was to the company's interest," Tr.Trans. at 628 (Hillas, Meritor), but the market was unfavorable to a stock sale.

In the end, Meritor's management and Bankers Trust "saw no other way to raise $200 million other than to sell a portion of the company .... the only way we could see to get there was to sell a portion of the branches, and it was driven by that and that alone." Tr.Trans. at 630 (Hillas, Meritor). See also Tr.Trans. at 5178–79 (High, Meritor) ("Q: [W]as there any other purpose for the transaction with Mellon and the restructuring that's listed in this capital plan other than to come into compliance with the capital requirements of the 1988 MOU? A: In my view, that was the only thing that we could determine that we could do to come into compliance with the MOU. It was clearly as a result of the MOU, we entered into this transaction."). Bankers Trust recommended "that we offer packages of our branches, and the liabilities that were represented in those branches.... The assumption was that, because the PSFS franchise was so valuable in the Philadelphia market, that someone would pay us a significant premium to acquire our—parts of our branch system." Tr.Trans. at 411 (McCarron, Meritor). See also Tr. Trans. at 939 (High, Meritor).

In the end Meritor found a willing buyer in Mellon for fifty-four of its branches. The sale of fifty-four branches to Mellon led to a deterioration in assets which spurred the 1991 Written Agreement and later problems at Meritor. Indeed, according to CFO High, "[t]here were concerns [after the Mellon sale], because the remaining institution, although being a lot smaller, we still had the same number of nonperforming assets, but now as a percentage of the remaining assets, it's a lot higher percentage. So it didn't

---

**27.** Goodwill was included in primary capital. While Meritor was required to reach a primary capital level of 6.5%, the FDIC regulations set the limit at 5.5% for fundamentally sound banks. See FDIC Capital Maintenance Rule, 12 C.F.R. § 325.3 (1985). When asked whether it was "common for the FDIC to require higher than minimum capital ratios in a written agreement," Director Fritts answered, "It wasn't uncommon at all. You didn't get a written agreement under normal circumstances unless the bank was either in problem status or near problem status, and when you've got a written agreement for that reason, the capital standard as it relates to that given bank was generally higher than mini-

mum." Tr.Trans. at 3040—Page 3041 (Fritts, FDIC).

**28.** Meritor had become a stock savings bank on September 22, 1983, and sold more than 35 million shares. Interestingly, as part of its public offering, the Offering Circular, which had been approved by the FDIC, explained the terms of the agreement between the FDIC and Meritor when Meritor acquired Western, specifically that the difference between fair value and book value was being treated as goodwill that could be counted towards regulatory capital. See Pl.Exh. 38/Def.Exh. 392 at 13 (Offering Circular).

solve the inherent problem of getting rid of the nonperforming assets. It, in some ways, exaggerated that problem in terms of percentages." Tr.Trans. at 959 (High, Meritor). CEO Hillas agreed that "when you sell that many branches, $6 billion worth of liabilities and all these other companies, you got rid of the most viable assets and were left with some others. The bank itself was viable, but it was carrying some rather heavy baggage at that time with the assets that couldn't be disposed of immediately." Tr.Trans. at 647 (Hillas, Meritor). The FDIC looked at the institution that was left and immediately told Meritor that instead of satisfying the terms of the 1988 MOU, there would now be a Written Agreement. The strong implication of this and other testimony was that the 1988 MOU doomed the bank.

Long term, selling the fifty-four branches to Mellon proved to be critical in Meritor's demise. "[T]he long-term impact [of selling branches to Mellon] was harmful to the long-term value of the enterprise, because we had accelerated the premium." Tr.Trans. at 638 (Hillas, Meritor). Chairman Hillas expanded by saying, "in these periods of duress for the whole financial industry, there simply weren't buyers out there, and you had to take the crown jewels and sell them in order to generate 200 million or any other significant number." Tr.Trans. at 630–31 (Hillas, Meritor).[29] At the trial John McCarron, executive vice-president and General Counsel of Meritor beginning in August 1988, agreed with Mr. Hillas. Initially, his principal function at Meritor was to dispose of various Meritor assets in order to meet the capital ratio in the 1988 MOU, so he was intimately involved in the process. He stated that the sale of branches to Mellon would not have occurred absent the 1988 MOU because the branches were "the most valuable part of the franchise, and what ended up happening— and this was predictable—was that people looked at our—what we would call our best branches and these were not necessarily the

branches that had the highest deposit levels but were the branches that were in areas that were expanding and in which we were able to generate more consumer assets, those being the suburban branches." Tr.Trans. at 413 (McCarron, Meritor). As the FDIC recognized in its 1991 examination of Meritor, "[t]he 1990 sale of two-thirds of the branches, especially those outside the immediate downtown, and the 'PSFS' tradename to Mellon Bank may have effectively doomed the institution." Pl.Exh. 407 at A–1.

The court finds that the FDIC would not have imposed the 1988 MOU on Meritor if the FDIC had treated the Western goodwill as real capital as required by the 1982 MOU. The Court finds that absent the increased capital levels in the 1988 MOU, Meritor would not have sold the 54 branches as it did. Further, the court finds that the sale of those branches lead to the rapid decline in Meritor's capital ratios because the remaining assets earned less income and were riskier than those Meritor had sold. *Thus, the FDIC breached the 1982 MOU when it required Meritor to sign the 1988 MOU or face stronger regulatory action.*

### C. Breach of Contract: 1991 Written Agreement:

Plaintiff alleges that the Defendant forced Meritor to sign the 1991 Written Agreement because it was not including the Western goodwill in Meritor's capital ratios.

The Agreement required Meritor to maintain a Primary Capital Ratio of not less than 8.5% and a Risk–Based Capital Ratio of not less than 10.5%—200 to 250 basis points higher than the regulations required. These ratios were based in part on the capital ratios the bank had included in its Capital Plan. *See* Def.Exh. 868 (FDIC memo to files) (Jun. 11, 1990). Meritor, however, stressed to the FDIC that those percentages were based on several assumptions including that Meritor FA had been sold and the ICCs retired. *See*

29. "I thought it was a necessary move for the bank because it was the only way that we could meet the requirements of the agreement with the FDIC." Tr.Trans. at 412 (McCarron, Meritor). "The motivation behind the sale was to satisfy the requirements of the MOU that we raise at least $200 million in capital." Tr.Trans. at 416

(McCarron, Meritor). "There was only one way that we could meet the 200 tangible capital. This was the only way that all parties, management, Bankers Trust included, that we could meet the 200 million tangible capital...." Tr. Trans. at 1083 (High, Meritor).

Tr.Trans. at 968 (High, Meritor); Tr.Trans. at 479 (McCarron, Meritor); Tr.Trans at 745 (Hillas, Meritor); Pl.Exh. 249; Pl.Exh. 578. The Agreement included the grandfathered Western goodwill in the Primary Capital Ratio and the Risk–Based Capital Ratio to the extent recognized by the FDIC. It also stated that the Agreement "shall" be renegotiated if at any time by act of Congress the "Bank may no longer consider grandfathered goodwill as a capital component . . ." Pl.Exh. 297 at 3. The Agreement prohibited the payment of dividends and increasing executive officer compensation while the Agreement was in effect. *See id.* It also required Meritor to make quarterly progress reports to the FDIC and Pennsylvania Secretary of Banking. *See id.* at 4. The agreement was signed by Chairman Hillas on January 25, 1991.

The 1991 Agreement was an outgrowth of the 1988 MOU. After Meritor had satisfied the demands of the 1988 MOU, the FDIC replaced it with even higher capital requirements and continued monitoring the bank's condition. Mr. McCarron and Mr. High went to New York shortly after the agreement to sell the 54 branches to Mellon was signed with the expectation and hope that Meritor would now be released from the 1988 MOU. However, during the meeting, they "were told that, even though we had satisfied the requirements of the [88] MOU, that it was necessary for there to be another agreement with the FDIC so that the FDIC could take enforcement action against us if they chose to do so in situations where the regulations might not otherwise permit them to." Tr.Trans. at 423 (McCarron, Meritor). In part this was because the assets that remained in Meritor were of a poorer quality. *See* Tr.Trans. at 3770–71 (Francisco, FDIC) (overdue loans and leases deteriorated); *see also* Pl.Exh. 300 (FDIC memo undated) ("We were concerned that the institution's downsizing plans could saddle the institution with an excess volume of either poor quality and/or low earning assets, and with a potentially intractable overhead problem."). Thus, the FDIC wanted Meritor to enter the Agreement to require a higher level of capital protection for the BIF. *See* Pl.Exh. 241 (FDIC Memo (Mar. 1, 1990)); Tr.Trans. at 3797 (Francisco, FDIC). The old line that no

good deed goes unpunished seems strangely relevant here.

The FDIC's continuing concern with Meritor's capital was the motivating factor for the Agreement. FDIC representatives told Mr. McCarron that a "reason[ ] for imposing a new agreement was that the quality of our capital was suspect, if you will, and that for that reason, it was necessary for us to have to meet higher capital requirements that would otherwise be the case." Tr.Trans. at 426 (McCarron, Meritor). The Meritor officers once again felt constrained to sign the Agreement without much room—if any—for negotiations. *See* Tr.Trans. at 435 (McCarron, Meritor). Indeed, the FDIC did not even make simple editing changes that Meritor suggested, such as correcting Meritor's address in the document. This demonstrates the balance of power that existed during the "negotiations" of the 1991 Written Agreement. Meritor's Board of Directors had no options other than signing the 1991 Written Agreement as it was presented to them.

Meritor's officers firmly believed the FDIC would not have imposed such high capital standards absent the Western goodwill. "[T]hey were saying fine, we'll include [goodwill] but we'll ignore it by setting these percentages so high that it is meaningless." Tr.Trans. at 642 (Hillas, Meritor). "I think clearly they didn't view it [goodwill] as capital. We surmised the only reason these ratios would have been at these levels . . . was it circumvented the [goodwill] agreement. I mean, we'll count the goodwill but you've got to have more capital than any of your peer groups." Tr.Trans. at 969–70 (High, Meritor). "It [goodwill] was included [in FDIC calculations], yes, but because it was included, we had to have more capital than we otherwise would have had to maintain." Tr. Trans. at 432 (McCarron, Meritor).

The FDIC's witnesses did not counter this view. Mr. Ketcha was the Regional Director responsible for Meritor during this time frame and advocated entering a Written Agreement with Meritor. He told the court that the FDIC had a two-step analysis when looking at goodwill on Meritor's balance sheet. First, it would be included as an

tangible asset on the books. Second, the examiners would "have to make a determination as to whether the bank had the ability, because of that goodwill, to generate income, to absorb losses...." Tr.Trans. at 4955 (Ketcha, FDIC). Mr. Ketcha also stated at trial that he "was aware there was a requirement to honor the goodwill the Meritor had previously put on its books." Tr.Trans. at 4874 (Ketcha, FDIC). However, saying the right words does not counter-balance actions that defeat the intent of a contractual agreement.

Ketcha was not alone in his assessment of Meritor's goodwill. Mr. Shull, who was brought in from the Nashville region to conduct the final examination of the bank in late 1991–early 1992, stated at trial that, "[w]hen you look at the entire condition of the bank, it [goodwill] was irrelevant. Goodwill would not save this bank." Tr.Trans. at 3421 (Shull, FDIC). Mr. Frank Fitzgerald was a FDIC examiner responsible for overseeing Meritor for 21 months in the early 1990s. At trial he stated that the risk profile of a bank could not be determined on an objective basis. "You have to use your knowledge and experience, look at the facts of a particular case, interrelate the various issues, understand the facts relative to where problems may lie, and make—draw from that a reasonable but subjective conclusion about what is the best way to resolve the problems." Tr.Trans. at 3678–79 (Fitzgerald, FDIC). In fact, in a memo after a meeting with Mr. McCarron and Mr. Ketcha exploring whether Meritor's Board of Directors would sign a Written Agreement, Mr. Fitzgerald wrote that the reason the Agreement was necessary was "that the asset quality profile of the bank would be worse post merger because of the sale of higher earning and better quality assets to Mellon." Def.Exh. 863 (FDIC memo to files dated Mar. 1, 1990). It was clear that the FDIC personnel considered the goodwill of no value and therefore did not count it in any real sense toward capital. This view was based on the fact that the goodwill did not help protect the FDIC insurance fund. Thus, the contract made an important promise but the operation level staff, that didn't like the promise, made it meaningless.

Mr. Frank Francisco was instrumental in the preparation of the 1991 Written Agreement. In his words, the Agreement was required because "[t]he bank had supervisory—had financial problems that we were concerned about, that required stronger action, in our view, than a memorandum of understanding, but fell short of the need to issue a cease and desist order." Tr.Trans. at 3714 (Francisco, FDIC). Francisco stated at trial that goodwill was exacerbating the losses that Meritor was experiencing in 1990 because it could not generate earnings and resulted in a loss of $54 million a year. *See* Tr.Trans. 3701 (Francisco, FDIC). Overall, the FDIC's attitude toward goodwill was one that discouraged its use and downplayed its role.

Thus, it is clear to the court that the FDIC was not looking at goodwill as capital, but during the time Ketcha was regional director, the FDIC's examiners were weighing goodwill as a separate, sub-category of capital that was not as desirable as other capital. The court also finds that the 1991 Written Agreement and its high capital requirements were a direct result of the FDIC's concern over the ability of Western goodwill to provide a capital cushion for the BIF. While the overall condition of the bank was troubling, it is clear to the court that the FDIC believed the management team in place was excellent and could turn the bank around. However, the Written Agreement handicapped Meritor because it increased the capital requirements to a level that required the bank to continue to sell its good assets, thus leaving an increasing pool of non-earning assets that were a drag on earnings and tangible capital. This lead to a downward death spiral for Meritor.

**D. The FDIC injured Meritor in December 1992 in conjunction with the closing of the bank.**

 Plaintiff argues Meritor was in compliance with the 1991 Agreement when Meritor was seized. Finally, plaintiff argues that the FDIC's breach of the 1982 MOU and 1991 Written Agreement directly caused the Pennsylvania Secretary of Banking to seize Meritor. While the government urges the court to find the FDIC did not actually close the bank and thereby did not harm Meritor,

the Court finds differently. While the FDIC may not have been the hand that turned the key, it was clearly in charge of the hand that turned the key that closed Meritor. Even the FDIC witnesses gave this government argument or assertion little credence.

### 1. *FDICIA*

In 1991, Congress passed the Federal Deposit Insurance Corporation Improvement Act (FDICIA), Pub.L. No. 102–242, 105 Stat. 2236, which became law on December 19, 1991. FDICIA was the FDIC's counterpart to FIRREA The FDICIA set forth new primary capital requirements for federally insured banks. Effective December 19, 1992, the FDIC published a final rule that implemented the requirements of the FDICIA. In that regulation the FDIC interpreted the FDICIA as prohibiting the inclusion of supervisory goodwill in calculating regulatory capital regardless of contractual language to the contrary.

During negotiations for the Written Agreement, the big concern for Meritor's officers was how the FDIC would "interpret the 2 percent tangible equity capital requirement [in FDICIA] to include our goodwill asset." Tr.Trans. at 449 (McCarron, Meritor). "We wanted basically to say if the agreement was broken, that that capital wouldn't count; this agreement would be renegotiated, because it hung so much on that, goodwill being included in capital." Tr.Trans. at 971 (High, Meritor). In an effort to make the Agreement flexible depending on how Congress ultimately structured the law, Meritor's officers inserted a paragraph in the Agreement which would require the Agreement to be renegotiated if goodwill wouldn't be grandfathered in to the capital requirements. "We were concerned about what [FDICIA] might do to the goodwill that was included in our capital. So we asked for and they included a provision saying that, if that event occurred, that the ratios in the agreement would be renegotiated or subject to renegotiation." Tr.Trans. at 434 (McCarron, Meritor).

Several times during 1992, Meritor sought direction on how the FDIC would interpret the goodwill requirements and specifically whether the Western goodwill would be grandfathered in under the regulations. As early as July 9, the FDIC was examining the issue of goodwill as it applied to Meritor and the prompt corrective action provisions of the FDICIA, but the information was not transmitted to Meritor. *See* Pl.Exh. 401 (FDIC Memo about Supervisory Goodwill (July 9, 1992)). After several attempts to receive verbal assurances and answers, Mr. Hillas wrote a letter seeking direction and clarification in October 1992. *See* Pl.Exh. 454 (Meritor letter (Oct. 14, 1992)). Mr. Hillas' concern was that if "tangible assets that are explicitly approved are not included in tangible capital a substantial amount of assets of this Bank that, by contract, have been fully included in capital for all purposes would be excluded from capital as a result of adoption of this final regulation [325.5(f)]." *See id.* at 2. The FDIC replied to this letter by handing a letter to Mr. Hillas on December 11, as they revoked the Bank's insurance and the PDB closed the bank. *See* Pl.Exh. 511 (FDIC Letter (Dec. 11, 1992)). In the letter Director Poling stated that the definition of tangible equity included in the new regulations excluded all intangible assets, including the Western Goodwill. *See id.* "Therefore, notwithstanding any other method of calculating subject bank's capital indices, for purposes of determining whether an institution is 'critically undercapitalized' pursuant to Section 28 of the [Federal Deposit Insurance] Act, the goodwill on the books of Meritor Savings Bank relating to the assisted acquisition of Western Savings Fund Society, Philadelphia, Pennsylvania, and any other intangible assets which do not meet the parameters enumerated in Section 325.2(s), will be excluded in measuring 'tangible equity.'" [as of dec. 19, 1992] Pl.Exh. 511: letter from FDIC Director Stanley J. Polling to Roger Hillas (Dec. 11, 1992).

The letter and its answer came too late for Meritor to respond. The FDIC effectively denied Meritor any opportunity to rework their books and assets to meet the 2% tangible equity threshold without including goodwill in the calculation.

### 2. *Project Zeta*

In anticipation of what the FDICIA's implementing regulations would require, Meri-

tor began to look for alternative ways to protect shareholders. Once again, the bank worked with Bankers Trust to develop Project Zeta as an attempt to find a way to save some of the bank's value for shareholders and satisfy the FDIC. The need for such an effort was made clear to the officers by the December 1991 bank examination. Mr. Shull, the FDIC bank examiner in charge of the 1991 examination stated that "[t]he bank was in terrible shape. The volume of poor quality assets was just voluminous. There was approximately $750 million worth of bad assets in the bank. There was over $400 million of nonperforming assets, meaning loans that were delinquent for more than 90 days. There was a large volume of other real estate. There was a large depreciation in the securities portfolio." Tr.Trans. at 3301–02 (Shull, FDIC). After hearing remarks like that in their post-examination meetings with the FDIC, "it became clear to management that we better start developing an exit strategy because, for whatever reason, the FDIC was going to take serious action against the institution." Tr.Trans. at 991 (High, Meritor). Project Zeta was that strategy. "Project Zeta attempted to ... show a method whereby Meritor could liquidate itself, if you will, to accomplish the goals of, presumably of the FDIC to relieve it of any exposure on its deposit insurance and to return a portion or the balance of what we thought was the value of the bank to its shareholders." Tr.Trans. at 447 (McCarron, Meritor).

Project Zeta was a proposal for FDIC assistance to help Meritor sell some of its assets immediately, and then slowly dispose of the rest as the market and interest rates turned around. See Tr.Trans. at 651 (Hillas, Meritor). Its purpose was to seek a "preemptive resolution of the institution while there is regional demand for its deposits and while asset values are high due to low interest rates." Pl.Exh. 357 (Project Zeta presentation (Febr. 28, 1992)). See also Tr.Trans. at 447 (McCarron, Meritor) (purpose was to liquidate Meritor while protecting FDIC fund and return portion of value to shareholders). Under the Zeta scenario, Meritor would have been divided into a "good" bank and a "bad" bank. The "good" bank would include all deposits and higher quality assets, while the "bad" bank would retain the nonperforming and high risk assets. See Pl. Exh. 357 at 13. The FDIC would provide a loan to fund the "bad" bank's shortfall, and any deposit premium received from the Acquirer of the "good" bank would go to the "bad" bank. The FDIC had recently started a unit that would consider such transactions in an effort to prevent bank failures and the resulting higher exposure to the BIF. See Tr.Trans. at 992 (High, Meritor); Tr.Trans. at 451 (McCarron, Meritor); Tr.Trans. at 651 (Hillas, Meritor).

The FDIC initially encouraged the bank to pursue Project Zeta. See Tr.Trans. at 451 (McCarron, Meritor) (bank told to go ahead and talk to other banks about Zeta); Tr. Trans. at 651 (Hillas, Meritor) (worked with unit at FDIC over summer); Pl.Exh. 395 (FDIC notes of meeting on Zeta (June 25, 1992)). Several banks showed interest in the arrangement including Mellon, First Fidelity and PNC. See Pl.Exh. 383 (Memo on Project Zeta—Acquiror Interest) (May 26, 1992). At that point the FDIC began approaching the interested banks, and Meritor ceased to have direct contact with those banks. Tr.Trans. at 451–52 (McCarron, Meritor). On July 16, 1992, the FDIC held an Information Meeting with interested banks to discuss the resolution of Meritor. At that meeting, it handed out a packet of materials which included a timetable for the resolution, showing a tentative resolution date of October 9. See Pl.Exh. 410 at CP 01934. As the court noted at trial, this timetable would serve to weaken plaintiff's efforts to sell the bank on an open basis. Few institutions would choose to buy something when they know the regulator plans to close it within the next three or four months. See Tr.Trans. at 4294.[30] Specifically, because

---

30. Mr. Hartheimer, a former associate director in the FDIC's Division of Resolutions, tried to counter the court's assessment at trial by saying the following: "But the open bank basis that Bankers Trust presented was not a structure that made it to the level of something that the FDIC could live with. I mean, the presumption here is that the FDIC, you know, kind of cut the legs off of this institution, and that's absolutely incorrect. If Bankers Trust had a structure that every one

in the closed bank scenario, the "FDIC has the power to disaffirm contracts and deliver assets on a [closed] basis[;] in a open bank transaction, the purchaser wouldn't get the same level of comfort." Tr.Trans. at 461 (McCarron, Meritor).

### 3. *Closing the Bank*

The FDIC and PDB began planning how to close Meritor, if that became necessary, early in 1992. By August 7, FDIC had sent a letter to PDB accepting the receivership of Meritor. *See* Pl.Exh. 417. Drafts of the documents that would terminate Meritor's insurance were being circulated at the FDIC by August 13. *See* Pl.Exh. 419. A week later the FDIC and PDB were reviewing lists of possible banks and holding companies that could absorb Meritor. *See* Pl.Exh. 422. At the same time, Secretary Hargrove was expressing concerns about how the two could close Meritor while it had a capital ratio of 7.5%, only 1% lower than required in the Written Agreement. *See* Pl.Exh. 421 at 1. Mr. Ketcha addressed her concerns by stating that the "Written Agreement clearly does not supersede, or preclude, the utilization of, the current Part 325 of the FDIC's Rules and Regulations in the computation of Meritor's capital ratios." Pl.Exh. 426 (FDIC letter (Aug. 26, 1992)). In that letter Ketcha stressed that the FDIC thought Meritor was in an unsafe and unsound condition regardless of capital levels. *See id.* at 2.

The FDIC asked the PDB to issue a failing bank letter for Meritor. The failing bank letter "requests the FDIC's assistance in resolving a failing bank. They cannot start their review process prior to getting such a notification." Tr.Trans. at 1867 (Hargrove, PA Secretary of Banking). In August, Secretary Hargrove sent a letter to the FDIC that discussed the status of Meritor and the fact that she was reviewing the failing bank

letter for Meritor at RD Ketcha's request. *See* Pl.Exh. 421.

On September 17, Secretary Hargrove sent the FDIC a failing bank letter and asked the FDIC to begin the process of resolving Meritor. *See* Pl.Exh. 434. In the letter she states that if Meritor is not recapitalized, she will appoint the FDIC as receiver. *See id.* In Meritor's September 1992 Consolidated Report of Income and Condition, Meritor's tangible capital had decreased to .66 percent of total tangible assets. *See* Pl.Exh. 446.[31]

At Meritor's October 1, 1992, Board of Directors' meeting, the FDIC asked the board to approve a resolution which would allow the FDIC to begin shopping the bank on a closed basis. *See* Pl.Exh. 441 (Ketcha letter asking for Board signatures (Sept. 29, 1992)); Pl.Exh. 450 (Minutes). At that time any hopes of selling parts of Meritor on an open basis died because on a closed basis the acquirer could get the FDIC to dissolve certain obligations that couldn't be dissolved on an open basis (lease agreements, etc.) *See* Tr.Trans. 651–652, 660–662 (Hillas, Meritor). The Board refused to sign the resolution at the October 1 meeting, but considered it again on October 15. "Chairman Hillas advised the Board that management does not believe the Bank is viable absent assistance from the FDIC. This conclusion is consistent with that reached in February 1992 with our financial advisors, Bankers Trust Company, and caused us to initiate discussions with the FDIC seeking assistance." Def.Exh. 418, Minutes of Meritor Board meeting (Oct. 15, 1992). At this meeting the Board adopted the FDIC's resolution which allowed the FDIC to begin pursuing merger partners for Meritor on an open or closed bank basis. "[I]n effect by signing this, we had turned the control of the institution over to the FDIC, because they reserve the right to

of these banks could live with, and in all their zeal they wanted to buy this institution, it would have been bought and we wouldn't have had to do what we had to do." Tr.Trans. at 4294 (Hartheimer). The court does not find this persuasive in light of the broad testimony given at trial and the documents that were submitted as evidence.

31. In that Statement, the bank inserted a comment about how the Western Goodwill was being

used: "The entire $239.5 million of goodwill reported on Schedule RC–M, item 6.c. arose in the supervisory merger of Western Savings Fund Society in 1982, and is grandfathered by the FDIC. Thus, in the calculation of the Bank's leverage and risk-based capital ratios all goodwill is considered a qualifying intangible asset, and therefore is not deducted from capital." Pl.Exh. 446 at 29.

meet with the potential bidders for the property." Tr.Trans. at 662–63 (Hillas, Meritor).

In November, the New York Regional Office began the process of gathering support for a Section 8(a) action that would revoke Meritor's FDIC insurance. The foundation for the 8(a) action was that Meritor had been "unable to formulate an acceptable capital plan that does not involve FDIC assistance. Due to inadequate capital relative to the bank's risk exposure, continued operating losses, and the poor quality of assets, the bank is not considered a viable institution." Def.Exh. 546 (FDIC internal Memo about proposed section 8(a) proceedings at 3 (Nov. 3, 1992)). The September Call Report data, which reported Meritor had tangible capital of 0.66% of tangible total assets, lead the FDIC to recommend that Meritor be required to increase Tier 1 capital by $271,000,000 in five days. "An increase of this magnitude would result in a pro forma adjusted tier 1 capital ratio of 4.7% based on July 20, 1992 examination data, exclusive of goodwill." *See id.* To Regional Director Ketcha, the $271 million addressed both the need to invest in earning assets and the need to offset amortizing goodwill. *See* Tr.Trans. at 4934–35 (Ketcha, FDIC). Meritor was made aware of this new capital requirement on December 11, as the FDIC was revoking its insurance and the PDB was closing its doors. Requiring this increase in capital in this short a time was as impossible as requiring Mr. Hillas to leap across the Atlantic Ocean in a single bound!

Prior to December 8th, Secretary Hargrove testified in an affidavit that she verified at trial that she had no intention of closing the bank. *See* Tr.Trans. at 1862 (Hargrove, PDB); Pl.Exh. 527. In that affidavit she stated that she received a call from Mr. Ketcha on the 8th where he asked her to close the bank soon because the FDIC had received a bid from Mellon for Meritor. *See* Pl.Exh. 527, Tr.Trans. at 1864–45 (Hargrove, PDB). At the FDIC Directors' meeting on December 9, Mr. Fritts told the FDIC directors that Meritor's tangible capital level of .66% "would be sufficient, as of December 19, 1992, for a finding that Meritor would be 'critically undercapitalized' when the prompt corrective action provisions of section 131" of the FDICIA took effect. *See* Pl.Exh. 502 at CP 00776.

While the FDIC did not turn the key that closed the bank, it completely controlled and instigated the actions of the hand that turned the key, the PDB. The evidentiary record clearly establishes that the Secretary of Banking was very concerned about possible liability PDB could face for closing the bank. Her concerns were raised at two FDIC Director meetings. *See* Def.Exh. 546 (FDIC internal Memo about proposed section 8(a) proceedings at 4, 6 (Nov. 3, 1992)) ("The state authority has expressed no objection to the case. Although a December 18, 1992 closing has been discussed, the chartering authority has indicated some reservations with regard to closing subject bank in view of the issues surrounding inclusion of goodwill as capital."); Pl.Exh. 502 (FDIC Directors Meeting Minutes) (Dec. 9, 1992) (Secretary Hargrove "had reservations about closing the institutions at that time due to the inclusion of more than $252 million of regulatory goodwill in the bank's capital".).

In addition, Secretary Hargrove stated that when the FDIC revoked Meritor's insurance it would provide support for PDB's conclusion that Meritor was in an unsafe and unsound condition and it would support PDB's closing Meritor. *See* Pl.Exh. 502 at 00776. As Secretary Hargrove admitted at trial, she could not close Meritor without FDIC "cooperation" because "she had no money to pay depositors." Tr.Trans. at 1898 (Hargrove, PDB). Also, once the FDIC revoked Meritor's insurance, the PDB must close Meritor. *See* Tr.Trans. at 1893 (Hargrove, PDB) (unlawful for a bank to operate in Pennsylvania without insurance); Tr. Trans. at 1920 (Hargrove, PDB). In fact Mr. Isaac testified that where a state did not close a bank after the FDIC withdrew insurance, the FDIC would threaten to sue the state for any harm that might result to the FDIC BIF. *See* Tr.Trans. at 1572 (Isaac, FDIC). In the end, "the commonwealth, in effect, turned it over to the FDIC as receiver or whatever, and it was immediately—a great many of the assets and liabilities were

immediately transferred to the Mellon Bank." Tr.Trans. at 667 (Hillas, Meritor).

The court finds that the FDIC is the entity that forced the seizure of the bank. The FDIC was concerned that any further delay in closing Meritor would result in a loss of the Mellon bid. The evidence is clear that absent the FDIC's prodding and withdrawal of Meritor's insurance, the PDB would not have acted to seize Meritor on December 11. The record is clear that Secretary Hargrove was concerned about whether the State of Pennsylvania would be liable for the closing of Meritor and had asked the FDIC for protection from liability. She was clearly hesitant to close the bank on her own. Indeed, the bank would not have been closed December 11 if the FDIC had not called Secretary Hargrove on December 8 and asked her to close the bank so the FDIC would not lose the Mellon offer. The action closing the bank was an FDIC action.

## CONCLUSION

As detailed in the previous pages, the court finds that the FDIC is liable for violating the terms of its 1982 Memorandum of Understanding (MOU) with Meritor regarding how the Western goodwill would be treated for capital purposes. The FDIC violated the agreement when it forced Meritor to enter the 1988 Memorandum of Understanding which required Meritor to obtain higher capital levels than its peers and when it failed to do so, to raise $200 million in tangible capital quickly. Because of the tight capital markets that existed in 1989 and 1990, this directly lead Meritor to sell fifty-four of its best branches and other assets. The FDIC also breached the 1982 MOU when it forced Meritor to enter a 1991 Written Agreement after satisfying the terms of the 1988 MOU. The 1991 Written Agreement imposed even higher capital standards on the bank. Meritor could not meet the requirements of the 1991 Agreement once the FDICIA prohibited the FDIC from counting goodwill as Tier One capital. Finally, the FDIC breached the 1982 MOU when it removed Meritor's FDIC insurance on December 11, 1992, which directly led the Secretary of the PDB to close the bank. Meritor and its shareholders were harmed by all of these actions. Thus, the FDIC is liable to Meritor for its breaches of the 1982 MOU.

## NEXT STEPS

The parties shall schedule a status conference with the court within sixty (60) days of the date this opinion is issued. The purpose of the status conference will be to determine the schedule for the next phase of this case— determining what damages, if any, the defendant owes the plaintiff.

Per the court's suggestion that a taking remedy might be available if this action were barred by the Non–Appropriated Funds Instrumentality Doctrine, the court directs each party to submit their analysis of whether an alternative taking remedy would be available in this court. The parties shall submit these memorandum within thirty (30) days of the of the date of this opinion. The memorandum shall not exceed twenty (20) pages.

It is so ORDERED.